Mr. Chief Justice TANEY
 

 delivered the opinion of the court.
 

 The plaintiff in error in the first of these eases is the marshal Of the United States for the district of Wisconsin, and the two eases have arisen out of the same transaction, and depend, ■to some extent, upon the same principles. On that account, they have been argued and considered together; and the following are the facts as they appear in the transcripts before ■ us:
 

 Sherman M. Booth was charged before Winfield Smith, a commissioner duly appointed .by the District Court of the United States for the district of Wisconsin, with having, on the 11th day of March, 1854, aided and abetted, at Milwaukee, in the said district, the escape of a fugitive slave from the deputy marshal, who had him in custody under a warrant issued by the district judge of the United States for that district, under the act of Congress of .September 18, 1850.
 

 Upon the examination before the commissioner, he was satisfied that an offence had been committed as charged, and that there was probable cause to believe that Booth had been guilty of it; and thereupon held him to bail to appear and answer before the District Court of the United States for the district cf Wisconsin, on the first Monday in July then next ensuing. But on the 26th of May his bail or surety in the recognisance delivered him to the marshal, in the presence of the commissioner, and requested the commissioner to recommit Booth to the custody of the marshal;' and he having failed to recognise again for his appearance before the District Court, the commissioner committed him to the custody of the marshal, to be delivered to the keeper of the jail until he should be discharged by due course of law.
 

 Booth made application on the next day, the 27th of May,
 
 *508
 
 to A. D. Smith, one of the justices of the Supreme Court of the State of Wisconsin, for a writ of
 
 habeas
 
 corpus, stating that he was restrained of his liberty by Stephen V. R. Ableman, marshal'of the United States for .that district, under the warrant of commitment hereinbefore mentioned; and alleging that his imprisonment was illegal, because the act of Congress of September 18, 1850, was unconstitutional and void; and also that the warrant was defective, and did not describe the offence created by that act, even if the act were valid.
 

 Upon this application, the justice, on the same day, issued the writ of
 
 habeas corpus,
 
 directed to the marshal, requiring him forthwith to have the body of Booth before him, (the said justice,) together with the time and cause of his imprisonment. The marshal thereupon, on the day above mentioned, produced Booth, and made his return, stating that he was received into his custody as marshal on the day before, and held in'custody by virtue of the warrant of the commissioner above mentioned, a copy of which he annexed to and returned with, the writ.
 

 To this return Booth demurred, as not sufficient in law to justify his detention. And upon the hearing the justice decided that his detention was illegal, and ordered the marshal to discharge him and set him at liberty, which was accordingly done.
 

 Afterwards, on the 9th of June, .in the same year, the marshal applied to the Supreme Court of the State for a
 
 certiorari,
 
 setting forth, in his application the proceedings hereinbefore mentioned, and charging that the release of Booth by 'the jus- • tice was erroneous and unlawful, and praying that his proceedings might be brought before the Supreme Court of the State for revision.
 

 The
 
 certiorari
 
 was allowed on the same day; and the writ was accordingly issued on the 12th of the same month, and returnable on the third Tuesday of the month; and on the 20th the return was made by the justice, stating the proceedings, as hereinbefore mentioned.
 

 The case was argued before the Supreme Court of the State, and on the 19th of July it pronounced its judgment, affirming
 
 *509
 
 the decision of the associate justice discharging Booth from imprisonment, with costs against Ableman, the marshal.
 

 Afterwards, on the 26th of October, the marshal sued out a writ of error, returnable to this court on the first Monday of December, 1854, in order to bring the judgment here for revision ; and the defendant in error was regularly cited to appear on that day; and the record and-proceedings were certified to this court by the clerk of the State court in the usual form, in obedience to the writ of error. And on the 4th of December, Booth, the defendant in error, filed a memorandum in writing in this court, stating that he had been cited to appear here in this case, and that he submitted it to the judgment of this court on the reasoning in the argument and opinions in the printed', pamphlets therewith sent.
 

 After the judgment was entered in the Supreme Court of . Wisconsin, and before the writ of error was sued out, the State court entered on its record, that, in the final judgment it had rendered, the validity of the act of Congress of September. 18, 1850,. and of February 12, 1798, and the authority of the marshal to hold the defendant in his custody, under the process mentioned in his return to the writ of
 
 habeas corf us,
 
 were respectively drawn in question, and the decision of the court in the final judgment was against their validity, respectively.
 

 This certificate was'not necessary to give this court jurisdiction, because the proceedings upon their face show that these questions arose, and how they were decided.; but it shows that at that time the Supreme Court of Wisconsin did not question their obligation to obey the writ of error, nor the authority of this court to re-examine their judgment in the cases specified. And the certificate is given for the purpose of placing distinctly on the record the points that were raised and decided in that court, in order that this court might have no difficulty in exercising its appellate power, and pronouncing its judgment upon all of them.
 

 We come now to the second ease.- At the January term of the District Court of the United States for the district of Wisconsin, after Booth had been set at liberty, and after the transcript of the proceedings in the case above mentioned had been
 
 *510
 
 returned to and filed in this court, the grand jury found a bill of indictment against Booth for the offence with which he was charged before the commissioner, and from which the State court had discharged him. The indictment was found on the 4th of January, 1855. On the 9th a motion was made, by counsel on behalf of the accused, to quash the indictment, which wa3 overruled by the court; and he thereupon pleaded not guilty, upon which issue was joined. On the 10th a jury was called and appeared in court, when he challenged the array; but the challenge was overruled and the jury empanelled. The trial, it appears, continued from day to day, until the 13th, when the jury found him guilty in the manner and form in which he stood indicted in the fourth and fifth counts. On the 16th he moved for a new trial and in arrest of judgment, which motions were argued on the 20th, and on the 23d the court overruled the motions, and sentenced the prisoner to be imprisoned for one month, and to pay a fine of $1,000 and the costs of prosecution ; and that he remain in custody until the sentence was complied with.
 

 We
 
 have stated more particularly these proceedings, from a sense of justice to the District Court, as they show that every opportunity of making his defence was afforded him, and that his case was fully heard and considered.
 

 On the 26th of January, three days after the sentence was passed, the prisoner by his counsel filed his petition in the Supreme Court of the State,-and with his petition filed a copy of the proceedings in the District Court, and also affidavits from the foreman and one other member of the jury who tried him, stating that their verdict was, guilty on the fourth and fifth counts, and not guilty on the other three; and stated in his petition that his imprisonment was illegal, because the fugitive slave law was unconstitutional; that the District Court .had no jurisdiction to-try or punish him for the matter charged against him, and that the proceedings and sentence of .that court were absolute nullities in law. Various other objections to the proceedings are alleged, which are unimportant in the questions now before the court, and need not, therefore, be particularly stated. On the next day, the 27th, the court directed
 
 *511
 
 two writs of
 
 habeas corpus
 
 to be issued — one to tbe marshal, and one to the sheriff of Milwaukee, to whose actual keeping the prisoner was committed by the marshal, by order of the District Court. The
 
 habeas corpus
 
 directed each of them to produce the body of the prisoner, and make known the cause of ■his imprisonment, immediately after the receipt of the writ.
 

 On the 80th of January the marshal made his return, not acknowledging the jurisdiction, but stating the sentence of the District Court as his authority; that the prisoner was delivered to, and was then in the actual keeping of the sheriff of Milwaukee county, by-order of the court, and he therefore had no control of the body of the prisoner; and if the sheriff had not re-' ceived him, he should have so. reported to the District Court,. and should have conveyed him to some other place or prison, as the court, should command.
 

 On the same day the sheriff produced the body of Booth before the State court, and .returned that he had been committed to his custody by the marshal, by vil’tue of a transcript, a true copy of which was annexed to his return, and which was the only process or authority by which he detained him.
 

 This transcript was a full copy of the proceedings and sentence in the District Court of the United States, as hereinbefore stated. To this return the accused, by his counsel, filed a general demurrer.
 

 The court ordered the hearing to be postponed until the 2d of February, and notice to be given to the district attorney of the United States. It was accordingly heard on that day, anfi on the next, (February. 3d,) the court decided, that the imprisonment was illegal, and ordered and adjudged that Booth be, and he was by that judgment, forever disóharged from that imprisonment and restraint, and he wap accordingly set at ■liberty. ' ' , . '
 

 On the 21st of April next following, the Attornéy General of the United States presented a petition to the Chief Justice ef the Supreme Court, stating briefly the facts in the case, and at the same time presenting an exemplification of the proceed- ' ings hereinbefore stated, duly certified'by the clerk of the State court, and averring ip. his petition that' Jhe State court had no.
 
 *512
 
 jurisdiction in the case, and praying that a writ of error might issue to bring its judgment before this court to correct the error; The writ of error was allowed and issued, and, according to the rules and practice of the court, was returnable on the first Monday of December, 1855, and a citation for the defend ant in error to appear on that day was issued' by the Chief Justice at the same time.
 

 No return having been made to this writ, the Attorney General, on the 1st of February, 1856, filed affidavits, showing that the writ of error had been duly served on the clerk of the Supreme Court of Wisconsin, at his office, on the 30th of May, 1855, and the citation served on the defendant in error on the 28th of Jube, in the same year. And also the affidavit of the district attorney of the United States for the district of Wisconsin, setting forth that when he. served the writ of error upon the clerk, as above mentioned, he was informed by the clerk, and has also been informed by one of the justices of the Supreme Court, which released Booth, “
 
 that the court had directed the clerk to make no return to the writ of error, and to enter no order upon the journals or records of the court concerning the same.
 
 ” And, upon these proofs, the Attorney General moved the court for an order upon the clerk to make return to the writ of error, on or before the. first day of the next ensuing term of this courtl The rule was accordingly laid, and on th22d of July, 1856, the Attorney General filed with the clerk of this cóurt the affidavit of the marshal of the distinct ot Wisconsin, that he had served the rule on the clerk on the 7th of the month above mentioned; and no return having been made, the Attorney General, on the 27th of February, 1857, moved for leave to file the certified copy of the record of the Supreme Court of Wisconsin, which he had produced with his application for the writ of error, and to docket the case in this court, in conformity with a motion to that effect made at the last tend. And the court thereupon, on the 6th of March, 1857, ordered the copy of the record filed-by the Attorney General to be received and entered on the docket of this court, to have the same effect and-legal operation as if returned by the clerk with the writ of error, and that' the case stand for argu
 
 *513
 
 ment at the next ensuing term, without further notice to either party.
 

 The case was accordingly docketed, but was not reached for argument in the regular order and practice of the court until the present term.
 

 This detailed statement of the. proceedings" in the different courts has appeared to be necessary in order to form a just estimate of the action of the different tribunals in which it has been heard, and to account for the delay ip the final decision of. a case, which, from its character, would seem to have, demtmded prompt action. The first; case, indeed, was reached for trial two terms ago. But as the two cases are different •portions of the same prosecution for the same offence, they unavoidably, to some extent, involve the same principles of law, and it would hardly have beeñ proper to hear and decide the first before the other-was -ready for hearing and decision. They have accordingly been argued together, by the Attorney General of the United States, at the present term. No counsel has in either case appeared'for the defendent'in error. But we have the pamphlet arguments filed and referred to by Booth in the first case, as hereinbefore mentioned, also the ■opinions and arguments of the Supreme Court of Wisconsin, and of the judges who compose it, in full, and are enabled", therefore, to see the grounds op which they rely to support their decisions.
 

 It will be seen, from the foregoing statement of facts, that a judge of the Supreme Court of the State'of Wisconsin in the first of' these cases, claimed and exercised the right to supervise and annul the proceedipgs of a commissioner of the United States, and to discharge a prisoner, who had been committed by the commissioner for an offence against the laws of this Government, and that this exercise of power by the judge was afterwards sanctioned and affirmed by the Supreme Court of the State.
 

 : In the second ease, the State court has gone a step furtner, and claimed and exercised jurisdiction over the proceedings and judgment of a District Court of the United States, and upon a summary and collateral proceeding, by
 
 habeas corpus,
 
 
 *514
 
 has set aside and annulled its judgment, and discharged a prisoner who had been tried and found guilty of an offence against the laws of,the United States, and sentenced to imprisonment by the District Court.
 

 And it further appears that the State court have not only claimed and exercised this jurisdiction, but have also determined that their decision is final and conclusive upon all the ■courts of the United States, and ordered their clerk to disregard and refuse obedience to the writ of error issued.by this court, pursuant to the act of Congress of 1789, to bring here for ex- • amination'and revision the judgment of the State court.
 

 These propositions are new in the jurisprudence of the United States, as well as of the States; and the supremacy of the State courts over the courts of the United States, in cases arising under the Constitution and laws of the United States, is now for the first time asserted and acted' upon in the Supreme Court of a State.
 

 The supremacy is not,' indeed, set forth, distinctly and broadly, in so many words, in. the printed opinions of the judges. It is intermixed with elaborate discussions of different provisions in the fugitive slave law, and of the privileges and power of the writ of
 
 habeas-corpus.
 
 But the paramount power of the State court lies at the foundation of these decisions; for .their commentaries upon the provisions of that law, and upon the .privileges and power of the writ of
 
 habeas corpus,
 
 were out of place, and their judicial action upon them without authority of law, unless they had the power to revise and control the proceedings in thé criminal ease of which they were .speaking; and their judgments, releasing the prisoner, and disregarding the writ of error from this court, can rest upon no other foundation.
 

 If the judicial power exercised in this instance has been reserved to' the States, no offence against the laws of the TTnited States can be punished by their own courts, without the permission .and according to the judgment of the courts, of the • State in which the party happens to be imprisoned; for, if the Supreme Court of Wisconsin possessed the power it has exercised in relation to offences against -the act of Congress in ques
 
 *515
 
 tion, it necessarily.follows that they must have the same judicial authority in relation to any other law of the United States; and, consequently, their supervising and controlling power would embrace-the whole criminal code-of the United States, and extend to offences against our revenue laws, or any other law intended to guard the different departments of the General Government from fraud or violence. And it would embrace all crimes, from the highest'to the lowest; including felonies, which are'punished with death, as well as misdemeanors, which are punished by imprisonment.' And, moreover, if the power is possessed by the Supreme Court of the State of Wisconsin, it must belong equally to every other State in the U nion, when the' prisoner is within its territorial limits; and' it is very certain that-'the State courts would not always agree in opinion; and it would often happen, that an act which was admitted to be an offence, and justly punished, in one State, would be regarded as innocent, and indeed as praiseworthy, in another.
 

 It would seem to be hardly necessary to do more than state the resiilt to which these decisions of the State courts must inevitably lead.- It- is, of itself, a sufficient and conclusive answer; jfor.no one will suppose that a Government which has now lasted nearly seventy years, enforcing its laws by its own tribunals, and preserving the union of the States, could have lasted a single year, or fulfilled the high trusts committed to • it, if offences against its laws' could. not have been punished without the consent of the State in which the culprit was found.
 

 The judges of the Supreme .Court of Wisconsin do not distinctly state from what source they suppose they have derived this judicial power. There can'be no such thing as judicial authority, unless it is conferred by a Government or sover-, eignty; and if the judges and courts of Wisconsin possess the jurisdiction they claim, they must derive it either from the United States or the State. It certainly has not been conferred on them by the United States; and it is equally clear it, was not in the power of the State to confer it, even if it had attempted to do so; for no State can authorize one of its.judges
 
 *516
 
 or courts to exercise judicial power, by
 
 habeas corpus
 
 or otherwise, within the j urisdiction of another and. independent Government. And although the State of Wisconsin is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the Constitution of the United Stages. And the powers of the General Government, and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignities, acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated tp the United States is as far beyond the reach of the judicial process issued by a State judge of a State court, as if the line of division was traced by landmarks and monuments visible to the eye. And the State of Wisconsin had no more power to authorize these proceedings of its judges and courts, than it would have had if the prisoner had been confined in Michigan, or in any other State of the Union, for an offence against the law's of the State in which he was imprisoned.
 

 It is, however, due to the State to say, that we do not find •this claim of paramount jurisdiction in the State courts over the courts of the United States asserted or countenanced by the Constitution ,or laws of the State. We find it only in the decisions of the judges of the Supreme Court. Indeed, at the very time these decisions were made, there was a statute of the State which declares that a person brought up on a .
 
 habeas corpus
 
 shall be remanded, if it appears that he is confined:
 

 “ 1st. By virtue of process, by any court or judge of the United States, in a ease where such court or judge has exclusive jurisdiction; or,
 

 “2d. By virtue of the final judgment or decree of any competent court of civil or criminal jurisdiction.” (Revised Statutes of the State of Wisconsin, 1849, ch. 124, page 629.)
 

 Even, therefore, if these cases depended upon the laws of. Wisconsin, it wmuld be difficult to find in these provisions such • a grant of judicial power as the-Supreme Court claims to have derived from the State. •
 

 But, As we have already said, questions of this kind must
 
 *517
 
 always depend upon the Constitution and laws of the United States, and not of a State. The Constitution was not formed merely to guard the States against danger from foreign nations, but mainly to secure union and harmony at home; for if this object could be attained, there would be but little danger from abroad; and to accomplish this purpose, it was felt Uy the ■statesmen who framed the Constitution, and by the people who adopted it, that it was necessary that many of the rights' of sovereignty which the States then possessed should be ceded to the General Government; and that, in the sphere of action assigned to it, it should be supreme, and strong enough to execute its own laws by its own tribunals, without interruption from a St,ate 'or from State, authorities. And it was evident that anything short of this would be inadequate to the main objects for which the Government was established; and that local interests, local 'passions or prejudices, incited and fostered by, individuals for sinister purposes, would lead to acts of aggression and injustice by one State upon the rights of another, which would ultimately terminate in violence and force, unless there was a common arbiter between them, armed with power enough to protect and guard the rights of all, by appropriate laws, to be carried into execution peacefully by its judicial tribunals.
 

 The language of the Constitution, by which this power is granted, is too plain to admit of doubt or to need comment. It declares that “this Constitution, and the laws of the United States which shall be passed in pursuance thereof, and "all treaties made, or which shall be made, under the authority of the United States,, shall be the supreme law of the land, an,d the judges in every.State shall be bound thereby,‘anything in the Constitution or laws of any State to the contrary notwithstanding.” ■
 

 But the supremacy thus conferred on this Government could not peacefully be maintained, unless it was clothed witii judicial power, equally paramount in authority to carry it into execution; for if left to the courts of justice of the several States, conflicting decisions, would unavoidably take place, and the local tribunals' could hardly be expected to be always free
 
 *518
 
 from the local influences of which we have spoken. 'And the Constitution.and laws and treaties of the United States, and the powers, granted to the Federal Government, would soon receive different interpretations in different States, and the Government of the United States would soon become one thing in one State and another thing in another. It was essential, therefore, to its very existence as a Government, that it should have the power of establishing courts of justice, altogether independent of State power, to carry.into effect its own laws; and that a tribunal should be established in which all eases which might arise under the Constitution and laws and treaties of the United States, whether in a State, court or a court of the United States, should be finally and conclusively decided. Without such a tribunal, it is obvious that there would be no uniformity of judicial decision ; and that the supremacy,- (which is but another name for independence,) so carefully provided in the clause of. the Constitution' above referred to, could not possibly be maintained peacefully, unless it was associated with this paramount judicial authority.
 

 Accordingly, it was conferred on the General Government, in clear, precise, and comprehensive terms. It is declared that its judicial power shall (among other subjects enumerated) extend to all cases in law and equity arising under the Constitution and laws of the United States, .and that in such cases, as well as the others there enumerated, this court shall have appellate jurisdiction both as to law and fact, with such exceptions and under .such regulations'as Congress shall make. The appellate power, it will be observed, is conferred on this court . in all cases or- suits in which such a question shall arise. It is not confined to suits in the inferior courts of the United States, but extends to all eases where such' a question arises, whether it be in a judicial tribunal of a State or of the United States. And it is manifest that this ultimate appellate power in a tribunal created by the Constitution itself was deemed essential to securé the independence-and supremacy of the General Government in the sphere of action assigned to it; to make the, Constitution and laws of the United States uniform, and the same in every State and to guard against evils which would
 
 *519
 
 inevitably arise from conflicting opinions between the courts of a State and of the United States, if there was no common arbiter-authorized to decide between them.
 

 The importance which the framers of the Constitution attached to such a tribunal, for the purpose of preserving internal tranquillity, is strikingly manifested by the clause which gives this court jurisdiction over the sovereign States which compose this Union, when a controversy arises between them. Instead of reserving the right to seek redress for injustice from .another State by their sovereign powers, they have bound themr selves to submit to.the decision of this court, and to abide by its judgment. And'it is not out of place to say, here, that experience has demonstrated that this power was not unwisely surrendered by the States; for in the time that has already elapsed " since this Government came into existence, several irritating and angry controversies have taken plac<j between adjoining ■States, in relation to their respective • boundaries, and which have sometimes threatened to end in force and violence, but for the power vested in this court to hear them and decide between them.
 

 The samé purposes are e]early indicated by the different language employed when conferring supremacy upon the laws of the United States,' and jurisdiction upon its courts. In the first case, it provides that “ this Constitution, and the laws of the United States
 
 which shall be made in pursuance thereof,
 
 shall be the supreme law of the land, and obligatory upon the judges in every State.” The words in italics show the precision and foresight which marks every clause in the instrument. The sovereignty to-be created was to be limited in its powers of legislation, and if it passed a law not authorized by its enumerated powers, it was not to be regarded as the supreme law of the land, nor were the State judges bound to carry it into execution. And as the courts of a State, andthe courts of the United States, might, and indeed certainly would, often differ as to the extent of the powers conferred, by the General Government, it was manifest that serious controversies would arise between the authorities of the United States and of the States, which must be settled by force of arms, unless some
 
 *520
 
 tribunal was created to decide between them finally and with out appeal.
 

 The Constitution has accordingly provided, as far as human foresight could provide, against this danger. And in conferring judicial power upon the Federal Government, it declares that the .jurisdiction of its courts shall extend to all cases arising under “ this Constitution ” and the laws of the United States — leaving out the words of restriction contained in the grant of legislative power which we have above noticed. The . judicial power covers every legislative act of Congress, whether it be made within the limits of its delegated powers, or be an assumption of power beyond the grants in the Constitution.
 

 This judicial power was justly regarded as indispensable, not merely to maintain the supremacy of the laws of the United States, but also to guard the States from any encroachment upon their reserved rights by the General Government. And as the Constitution is the fundamental and supreme law, if.it appears that an act' of Congress is not pursuant to and within the limits of the power assigned to the Federal Government, it is the duty of the courts of the United States to declare it unconstitutional and void. The grant of judicial power is not confined to the administration of law's passed in pursuance to the provisions of the Constitution, nor confined to the interpretation of such laws; but, by the very terms of the grant, the Constitution is under their view when any act of Congress is brought before them, and it is their duty to declare the law void, and refuse to execute it, if it is not pursuant to the legislative powers conferred upon Congress. And as the final .appellate power in all such questions is given to this court, controversies as to the respective powers of the United States and the States, instead of being determined by military and physical force, are heard, investigated, and finally settled, with the calmness and deliberation of judicial inquiry. And no one can fail to see, that if such an arbiter had not been provided, in our complicated system of government, internal tranquillity could not have been preserved; and if such controver sies were left to arbitrament of physical force, our Government,. State and National, would soon cease to be Governments
 
 *521
 
 of laws, ;and revolutions "by forcé of arms would take the place of courts of justice and judicial decisions.
 

 . In organizing such a tribunal, it is evident that every precaution was taken, which human wisdom could devise, to fit it for the high duty with which it was intrusted. It was not left to Congress to create it by. law; for the States could hardly be expected to confide' in the impartiality of a tribunal created exclusively by the General Government, without any participation on their part. And as the performance - of its duty would sometimes come in conflict with individual ambi-' tion or interests, and powerful political combinations, an act of 'Congress establishing such a tribunal might be repealed in order to establish another more subservient to the predominant political influences or excited passions of the day. This tribunal, therefore, was erected, and the powers of which we have spoken conferred upon it, not by the Federal Government, but by the people of the States, who formed and adopted that Government, and conferred upon it all the powers, legislative, executive, and judicial, which it now possesses. And in order to secure its independence, and enable it faithfully and firmly to perform its duty, it engrafted it upon the Constitution itself, and declared that this court should have appellate power in all cases arising under the Constitution and laws of the United States. So long, therefore, as this Constitution shall endure, this tribunal must exist with it, deciding in the peaceful forms of judicial proceeding the angry and irritating controversies between sovereignties, which in other countries have been determined by the arbitrament of force.
 

 These principles of constitutional law are confirmed and illustrated by the clause which confers legislative power upon Congress. That power is specifically given in article 1, section 8, paragraph 18, in the following words :
 

 “ To make all laws which shall be necessary and proper to. carry into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the Unitéd States, or in any department or officer thereof.”
 

 Under this clause of the Constitution, it became the duty of Congress'to pass such laws as were necessary and proper to
 
 *522
 
 ■carry into execution the powers vested in the judicial department. And in the performance of this duty, the First Congress, at its first session, passed the act of 1789, ch. 20, entitled “
 
 An act to establish the judicial courts of the United States.”
 
 It will be remembered that many of the members of the Convention were also members of this Congress, and it cannot be supposed that they did not understand the meaning and intention of the great instrument which they had so anxiously and deliberately considered, clause by clause, and assisted to frame. And the law they passed to carry into execution the powers vested in the judicial department of the Government proves, past doubt, that their interpretation of the appellate powers-conferred on this court was the same with that which we have now given; for by the 25th section of the act of 1789, Congress authorized writs of error to be issued from this court to a State court, whenever a right had been claimed under the Constitution or' laws of the United States, and the decision of the State court was against it. And to make this' appellate power effectual, and altogether independent of the action of State tribunals,- this act further provides, that .upon writs of el-ror to a State' court, instead of remanding the cause for a final .decision in the State court, this .court may at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award, execution.
 

 . These provisions in the act of ,1789 tell us, in language not To be mistaken, the great importance which the patriots and statesmen of the First Congress attached to' this appellate power, and the foresight and care with which they guarded its free and independent exercise against interference or obstruction by. States or State tribunals.
 

 In the case before the Supreme Court of'Wisconsin, a right was claimed under the Constitution and laws of the United States, and the decision .was against the right claimed; and.it refuses obedience to the writ of error, and regards its own judgment as final. • It has not only reversed and annulled the judgment of the District Court of the United States, but it has reversed and annulled the provisions of the Constitution, itself,
 
 *523
 
 and the.act of Congress of 1789, and made the superior and appellate tribunal the inferior and subordinate one.
 

 We
 
 do not question the authority of State court, or judge, who is authorized by the laws of the State to issue the writ of
 
 habeas corpus,
 
 to issue it in any case where the party is imprisoned within its territorial limits, provided it does not appear, when the application is made, that the person imprisoned is in custody under the authority of the United States. The court or judge has a right to inquire, in this mode of proceeding, for what cause and by what authority the prisoner is confined within the territorial limits of the State sovereignty. And it is the duty of the marshal, or other person having the custody of the prisoner, to make known to the judge or court, by a- proper return, the authority by which he holds him in custody. This right to inquire by process of
 
 habeas corpus,
 
 and the duty of the officer to make a return, grows, necessarily, out of the complex character, of our Government, and the ex- . istence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each within its sphere of action, prescribed by the Constitution of the United States, independent Of the other. But, after the return is made, and the State judge or court judicially apprized that the party is in custody under the authority of the United States, they can proceed no further. They then know that the prisoner is within the dominion and jurisdiction of another Government, and that neither the writ of
 
 habeas corpus,
 
 nor any other process issued under State authority, can pass' over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offence against their laws, their tribunals alone can punish him. If he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress. And although, as we have said, it is the duty of the marshal, or other person holding him, to make known, by a proper return, the authority under which he detains him, it is at the same time imperatively his duty to obey the process of the United States, to hold the prisoner in custody under it, and to refuse obedience to the mandate or
 
 *524
 
 process of any other Government. And .consequently it is his duty not to take-the prisoner, :nor suffer.him to be taken, before a State judge or court upon a-
 
 habeas-
 
 corpus-issued under State authority. No State, judge or court, after they are judicially informed that tfte’ party, is imprisoned'uuder the authority of the United.- States, has any right to interfere with him, or to require him to be brought before them... And if the authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal dr other authorized officer or agent of the United. States, in any respect, in the custody of his prisoner, it .would be. his duty
 
 to
 
 resist it, and to call to his aid any foree that might be necessary to maintain the authority of law against illegal interference. No judicial, process, whatever form it may assume, can have any. lawful authority outside of the limits of the'jurisdiction of the .court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence.
 

 Nor is there anything in this supremacy of the General Government, or the jurisdiction of its judicial tribunals, to awakéa the jealousy or offend the natural and just pride of State sovereignty. Neither this Government, nor the powers of which we are speaking, were forced upon the States. The Constitution of the United States, with all the powers conferred by it on the General Government, and surrendered by the States, was the voluntary act of the people of the several States, deliberately done, for their own protection and safety against injustice from one another. And their anxiety to preserve it in full force, in all its powers, and to guard against resistance to or evasion of its authority, on the part of a State, is proved by the clause which requires that the members of the State Legislatures, and all executive and judicial officers of the several States, (as well as those of the General Government,) shall' be bound, by oath,or affirmation, to support this Constitution. This is the last and closing clause of the Constitution, and inserted when the whole frame of Government, with the powers hereinbefore specified, had. been adopted by the Convention; and it was in that form, and,with tírese powers, that the Con
 
 *525
 
 stitution was submitted to tbe people of the several States, for tbeir consideration and decision.
 

 Now, it certainly can be no humiliation to the citizen of a republic to yield a ready obedience to the laws as administered by the constituted authorities. On the contrary, it is among his first and highest duties as a citizen, because free government cannot exist without it. Nor can it be inconsistent with the dignity of a sovereign State to observe faithfully, and in the spirit of sincerity and truth, the compact into which it voluntarily entered when it became a State of this Union. On the contrary, the highest honor of sovereignty is untarnished faith. And certainly no faith could be more deliberately and solemnly pledged than that which every State has plighted to the other States to support the Constitution as it is, in all its provisions, until they shall be altered in the manner which the Constitution itself prescribes. In the emphatic language of the pledge required, it is
 
 to support this Constitution.
 
 And .no power is-more clearly conferred by the Constitution and laws of the United States, than the power of this court to "decide, ultimately and finally, all cases arising under such Constitution and laws; and for that 'purpose to bring here for revision,. by writ of error, the judgment of a State court, where such questions have arisen, and the right claimed under them denied by the highest judicial tribunal in the State.
 

 "We are sensible that we have extended the examination of these decisions beyond the limits required by any intrinsic difficulty in the questions. But' the decisions in question were made by the supreme judicial tribunal of the State; and when a court so elevated in its position has pronounced a judgment which, if it bould be maintained, would subvert the very foundations of this Government, it seemed to be the duty of this court, when exercising its. appellate'power, to show plainly the grave errors into which the State court has fallen, and the consequences to which they wotild inevitably lead.
 

 But it can-hardly be necessary to point out the errors which followed their mistaken view of the jurisdiction they might lawfully exercise; because, if there was any defect of power in the commissioner, or in his mode of proceeding, it was for the
 
 *526
 
 tribunals of the United States to revise and correct it, and not for a State court. And as regards the decision of the District Court; it had exclusive and final jurisdiction by the laws of the United States; and neither the regularity of ifs proceedings nor'the validity of its sentence could be called in .question in any other court, either of a State or the United States, by
 
 habeas corpus
 
 or any other process.
 

 But although we think it unnecessary to discuss these ques- . tions, yet, as they have been decided by the State court, and are before us on the record, and we are not willing to be misunderstood, it is proper to say that, in the judgment.of this court, the act of Congress commonly called the fugitive slave law is, in all of its provisions, fully authorized by the Constitution of the United States; that the commissioner had lawful authority to issue the warrant and commit the party, and that his proceedings were regular and conformable, to law. We have already stated the opinion and judgment of the court as to the exclusive jurisdiction of the District Court, and the appellate powers which this court is authorized and required to exercise.. And if any argument was needed to show the wisdom and necessity of this appellate power, the cases before us sufficiently prove it, and at the same time emphatically call for its exercise.
 

 The judgment of the Supreme Court of Wisconsin must therefore be reversed in each of the cases now before the court.