SPECIAL PROSECUTOR OF the STATE
OF NEW YORK, Plaintiff,

v.

UNITED STATES ATTORNEY FOR the
SOUTHERN DISTRICT OF NEW
YORK and Director, United States Mar-
shals Service, Defendants.

No. 74 Civ. 1912.

United States District Court,
S. D. New York.

May 13, 1974.

Maurice H. Nadjari, Sp. Prosecutor, State of New York (Stephen J. Fallis, Jordan J. Fiske, Sp. Asst. Attys. Gen., of counsel), for plaintiff.

Paul J. Curran, U. S. Atty., Southern District of New York (John W. Nields, Jr., Rudolph W. Giuliani, Steven J. Glassman, Asst. U. S. Attys., of counsel), for defendants.

BAUMAN, District Judge.

On May 1, 1974, the Special Prosecutor of the State of New York, plaintiff herein, sought and obtained from Justice Murtagh of the Supreme Court, New York County, an order to show cause directing the United States' Attorney for the Southern District of New York and the Director of the United States Marshals Service, defendants herein, to show cause why they should not be ordered to produce one Robert Leuci, a New York City policeman, before a New York County grand jury. That day the Murtagh order was served upon the defendants who immediately and quite properly[1] removed the proceeding to this court pursuant to 28 U.S.C. § 1442(a)1.[2] The court has now heard oral argument on plaintiff's motion, and both sides have submitted briefs and affidavits in support of their respective positions. For the reasons that follow, the order to show cause is vacated and the action dismissed.

I.

Some factual background is necessary to provide a context for the instant proceeding. The narrative that follows, however, purports only to recite those facts which are undisputed and is unencumbered, I trust, by the rhetorical baggage that has freighted these proceedings from the outset.

Robert Leuci, a detective in the New York City Police Department, has been assisting various federal and state law enforcement agencies since early 1971. Between April, 1971 and approximately July, 1972 he worked as an undercover agent under the direction of prosecutors in the United States Attorney's Office for the Southern District. In that capacity he is alleged to have aided in the commencement of several cases, most notably United States v. Edmund Rosner, et al., 72 Cr. 782, an indictment returned in this district in July, 1972 and tried before me in November and December, 1972.[3] Leuci was the government's principal witness at that trial, and was cross-examined vigorously and extensively about prior criminal acts committed while a member of the Police Department. He admitted only to four such acts, all of which allegedly took place prior to his decision to cooperate with the government. From July, 1972 to the present Leuci has been the beneficiary of the protection afforded by §§ 501–504 of the Organized Crime Control Act of 1970,

1. See Willingham v. Morgan, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); Tennessee v. Davis, 100 U.S. 257, 25 L.Ed. 648 (1879).

2. 28 U.S.C. § 1442(a)1 provides:
"(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending;
(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue."

3. The defendant Rosner was convicted of five of the eight counts, and his conviction has been affirmed by our Court of Appeals, 485 F.2d 1213 (2d Cir. 1973). A petition for certiorari is now pending in the United States Supreme Court.

Pub.L. 91–452, 84 Stat. 922, 18 U.S.C. Chap. 223 (preceding § 3481),[4] or what is colloquially termed federal protective custody.

In August, 1973 the United States Attorney made Leuci available to the Special Prosecutor, whose office, it should be noted, had been established by the Governor of New York to ferret out and prosecute corruption in the state's criminal justice system. Several investigations in which Leuci had been engaged for the United States Attorney were simultaneously transferred to that office. From that time onward, although he has remained in federal protective custody, Leuci worked with the members of the Special Prosecutor's staff in the pursuit of these investigations.

In February, 1974 a joint investigation into corruption in the Special Investigations Unit of the New York City Police Department was commenced by the United States Attorney's Offices for the Southern and Eastern Districts of New York. It appears that evidence disclosed during this investigation caused members of the United States Attorney's Office for this district to examine anew the truth of Leuci's previous accounts of the extent of his criminal activities. In addition, on March 21, 1974, Rosner filed a motion for a new trial, in 72 Cr. 782, in which it was alleged that Leuci had committed perjury at the trial by failing to disclose various criminal acts. Leuci appears to have been subjected to persistent questioning, and finally, on April 17, 1974, he admitted to representatives of the United States Attorney's Offices for the Southern and Eastern Districts that his criminal conduct had been more extensive than he had previously conceded. Agents of the federal government have subsequently been engaged in investigating these new revelations.

The essence of the present controversy is that since April 17, the United States Attorney has refused to make Leuci available to the Special Prosecutor. The application to Justice Murtagh on May 1, now before this court, is designed to compel his production. The Special Prosecutor contends, in brief, that Leuci's testimony is crucial to the successful prosecution of several cases pending before the grand jury, and that a reassessment of his credibility may have an important bearing on the validity of indictments already filed. The United States Attorney, in turn, disavows any intention of withholding Leuci from the Special Prosecutor for an extended period,

---

4. Organized Crime Control Act of 1970, Title V, provides:

"Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

"Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

"Sec. 503. As used in this title, 'Government' means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

"Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title."

but insists that he requires sufficient time to "debrief" Leuci adequately and fully to investigate his new disclosures. Both sides have embellished their arguments with extensive accusations of bad faith that do not merit repetition here.

In resolving this controversy, however, I am not required to pass upon the merits of the prosecutorial policies followed by the parties to this action. For I have determined that in the present posture of the case, this court lacks jurisdiction to grant the relief which the Special Prosecutor seeks. It is to this matter that I now turn.

## II.

▮ Jurisdiction of the federal court on removal is, in a limited sense, a "derivative" jurisdiction. Where the state court lacks jurisdiction of the subject matter, the federal court acquires none, even though in a like suit originally brought in a federal court jurisdiction might have been present. Minnesota v. United States, 305 U.S. 382, 389, 59 S. Ct. 292, 83 L.Ed. 235 (1939); Lambert Run Coal Co. v. Baltimore & Ohio R. Co., 258 U.S. 377, 383, 42 S.Ct. 349, 66 L.Ed. 671 (1922). The problem for resolution, therefore, is whether the Supreme Court of New York had jurisdiction over this claim prior to its removal here. Stapleton v. $2,438,110, 454 F. 2d 1210 (3d Cir. 1972). If it lacked such subject matter jurisdiction, removal cannot cure the deficiency and the action must be dismissed regardless of whether there exists "original" federal jurisdiction over such a claim. Unlike § 1441, § 1442(a)(1) is not keyed to the "original" jurisdiction of the federal courts. Rather, it is predicated upon an independent right given to federal officers whenever a suit is instituted against them in a state court for any act "under color" of federal office.[5] Since "original" federal jurisdiction is neither required for removal under § 1442(a)(1), nor relevant under the doctrine of "derivative" jurisdiction, I find it unnecessary to consider whether plaintiff could initially have brought this action in federal court.

▮ It is clear that the removal by the United States Attorney is neither a waiver of the right to question jurisdiction, nor tantamount to a governmental consent to be sued. Minnesota v. United States, supra at 388.

## III.

▮ Defendants initially argue that the doctrine of sovereign immunity bars the instant action because it is one brought against the federal government. This doctrine prohibits the maintenance of any suit against the United States in the absence of governmental consent.[6] Its scope encompasses suits seeking compensation for past harms and those seeking prevention of future ones. Contrary to the Special Prosecutor's contention it is not limited to tort claims.[7] Likewise, utilization of the doctrine is not restricted to actions where the United States is sued in its own name. The protection of sovereign immunity extends as well to officials and instrumentalities of the government, where the courts characterize the actions of these agents as the acts of the United States.[8] The denomination of the party defendant by the plaintiff is clearly not the test of wheth-

5. In cases like this one, Congress has decided that federal officers and indeed the federal government itself, require the protection of a federal forum. Willingham v. Morgan, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969).

6. Consent is usually in the form of legislation (i. e. Federal Tort Claims Act). No such consent is asserted here.

7. See Larson v. Domestic & Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628

(1949); Leonhard v. Mitchell, 473 F.2d 709 (2d Cir. 1973), cert. denied 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973); McQueary v. Laird, 449 F.2d 608 (10th Cir. 1971); Von Hennig v. Clark, 191 Misc. 261, 76 N.Y.S.2d 350 (Sup.Ct., N.Y.1947).

8. Note, Developments in the Law: Remedies Against the United States and its Officials, 70 Harv.L.Rev. 827, 829 (1957).

er a suit is against an officer individually or against his principal. Larson v. Domestic & Foreign Corp., 337 U.S. 682, 687, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The general rule is that a suit is against the sovereign if the effect of the judgment would be "to restrain the Government from acting, or to compel it to act." Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963). There are two recognized exceptions to this rule. Thus, a suit against a government officer in his official capacity will not be regarded as a suit against the sovereign, and hence not subject to defeat by the doctrine of sovereign immunity, if there exists (1) action by officers beyond their statutory powers or (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are unconstitutionally void. Malone v. Bowdoin, 369 U.S. 643, 647, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962).

 There has been no contention by the Special Prosecutor that the United States Attorney has acted in an "unconstitutional" manner. His claim does purport, however, to come under the first exception by alleging that "the United States Attorney is being proceeded against personally for ultra vires acts grossly in excess of his authority as a federal officer." [9] Resolving this issue would, of necessity, involve a determination of the question whether the United States Attorney abused his discretion in placing Leuci under protective custody and preventing the Special Prosecutor from obtaining access to him. This I decline to do. In view of my conclusion that, quite apart from the sovereign immunity bar, the New York Supreme Court lacked jurisdiction to determine this matter, I see no need to examine the merits of accusations obviously colored by the ill feelings between the litigants.

## IV.

There can be little doubt that what the Special Prosecutor sought of Justice Murtagh was the issuance of process in the nature of a writ of habeas corpus ad testificandum.[10] The question before me then, is whether a state court is possessed of the power to order the production of an individual in federal custody. Because the resolution of this question touches on several basic assumptions underlying the relationship between state and federal governments, it is necessary to consider the historical antecedents of the doctrine with some care.

The problem of state court power over those in federal custody first came before the Supreme Court in Ableman v. Booth, 21 How. 506, 62 U.S. 506, 16 L. Ed. 169 (1859). A state court had twice granted writs of habeas corpus to a prisoner held in federal custody on charges of aiding and abetting the es-

9. Plaintiff's Supplemental Memorandum, p. 13.

10. The order signed by Justice Murtagh provided, in pertinent part:
"Upon a reading of the annexed affidavit of Special Assistant Attorney General Stephen J. Fallis; it is
ORDERED: that the United States Attorney for the Southern District of New York and the Chief United States Marshal show cause why an order of this Court should not be entered directing them to produce Detective Robert Leuci before a Grand Jury empanelled by this Court; and it is further
ORDERED: that the United States Attorney for the Southern District of New York and the Chief United States Marshal show cause why they should not desist from interfering with and preventing the appearance and testimony of Detective Robert Leuci before a Grand Jury empanelled by this Court . . . . ."
Although it is not denominated an application for a writ of habeas corpus ad testificandum, the show cause order plainly seeks to require federal authorities to produce a person in their custody before a state grand jury. That is precisely the object of such a writ.
Elsewhere in papers submitted to this court the Special Prosecutor claims that he simply sought the opportunity to serve Leuci with a subpoena. Although such relief is nowhere requested in the show cause order, such omission is immaterial. Ableman v. Booth, infra, draws no distinction between writs of habeas corpus and other forms of state court process.

cape of a fugitive slave. The Supreme Court, speaking through Chief Justice Taney, unanimously held that a state court lacked power to inquire into the custody of a federal prisoner, even if it concluded that such custody was unconstitutional. In a passage that has such significance for the resolution of the present altercation that it may justify the inordinate length of the quotation, the Court stated:

"We do not question the authority of State court, or judge, who is authorized by the laws of the State to issue the writ of habeas corpus, to issue it in any case where the party is imprisoned within its territorial limits, provided it does not appear, when the application is made, that the person imprisoned is in custody under the authority of the United States. The court or judge has a right to inquire, in this mode of proceeding, for what cause and by what authority the prisoner is confined within the territorial limits of the State sovereignty. And it is the duty of the marshal, or other person having the custody of the prisoner, to make known to the judge or court, by a proper return, the authority by which he holds him in custody. This right to inquire by process of habeas corpus, and the duty of the officer to make a return, grows, necessarily, out of the complex character of our Government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each within its sphere of action, prescribed by the Constitution of the United States, independent of the other. *But, after the return is made, and the State judge or court judicially apprized that the party is in custody under the authority of the United States, they can proceed no further. They then know that the prisoner is within the dominion and jurisdiction of another Government, and that neither the writ of habeas corpus, nor any other process issued under State authority, can pass over the line of division between the sovereignties.* He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offence against their laws, their tribunals alone can punish him. If he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress. And although, as we have said, it is the duty of the marshal, or other person holding him, to make known, by a proper return, the authority under which he detains him, it is at the same time imperatively his duty to obey the process of the United States, to hold the prisoner in custody under it, and to refuse obedience to the mandate or process of any other Government. And consequently, it is his duty not to take the prisoner, nor suffer him to be taken, before a State judge or court upon a habeas corpus issued under State authority. *No State judge or court, after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him, or to require him to be brought before them.* And if the authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal or other authorized officer or agent of the United States, in any respect, in the custody of his prisoner, it would be his duty to resist it, and to call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence." 62 U.S. at 523–524 [Emphasis supplied].

The restrictions which *Ableman* imposed on the reach of state court process were reaffirmed and strengthened in Tarble's Case, 13 Wall. 397, 80 U.S. 397, 20 L.Ed. 597 (1872). There, one Edward Tarble had enlisted in the Army.

His father sought and obtained from a state court a writ of habeas corpus discharging him on the grounds that he had enlisted as a minor without his father's consent. The Supreme Court followed *Ableman* and reversed the judgment of the state court; it denied the authority of a state court to consider, by way of habeas corpus, the legality of any federal detention, be it judicial or executive. The Court placed particular emphasis on the supremacy of the Constitution and the concomitant supremacy of the federal government. "There are within the territorial limits of each State two governments, restricted in their spheres of action, but independent of each other, and supreme within their respective spheres. . . . Such being the distinct and independent character of the two governments, . . . it follows that neither can intrude with its judicial process into the domain of the other, except so far as such intrusion may be necessary on the part of the National government to preserve its rightful supremacy in cases of conflict of authority." (80 U.S. at 406–407). *Tarble* expanded the holding of *Ableman* in two significant respects. First, the Court did not limit the definition of custody to confinement pursuant to a judgment of conviction in a federal district court; any constraint imposed by an agency of the federal government is sufficient. Second, the Court refused to limit *Ableman* "to cases where a prisoner is held in custody under undisputed lawful authority of the United States, as distinguished from his imprisonment under claim and color of such authority." In other words, state inquiry must cease

when an arguable claim of federal authority is asserted, whether or not such claim ultimately proves to be valid.

■ Since *Ableman* and *Tarble*, there has been no serious challenge to the principle that state courts possess no power to remove a person from the jurisdiction of federal courts or agencies by writ of habeas corpus. The principle has been consistently reaffirmed both in academic fora [11] and by various courts which have addressed the question.[12] It is, in fact, simply a variant of the well established doctrine that the court which first assumes control over the subject matter of litigation—be it persons or property—shall retain exclusive jurisdiction over it until it has exhausted its remedies. See Covell v. Heyman, 111 U.S. 176, 4 S.Ct. 355, 28 L.Ed. 390 (1884). In speaking of a federal prisoner in Ponzi v. Fessenden, 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922), the Supreme Court stated: "Until the end of his term and his discharge, no state court could assume control of his body without the consent of the United States." See also, Stewart v. United States, 267 F.2d 378 (10th Cir. 1959), cert. denied, 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 83 (1959); Little v. Swenson, 282 F.Supp. 333 (W.D.Mo.1968); Hollman v. Wilkinson, 124 F.Supp. 849 (M. D.Pa.1954).

New York State has recognized, by recent legislative enactment, the necessity of securing the consent of federal authorities in order to obtain control of a witness in federal custody. § 650.30 of the Criminal Procedure Law, set out in full in the margin,[13] provides that a

11. See, e. g., Warren, Federal and State Court Interference, 43 Harv.L.Rev. 345 (1930); Note, Limitations on State Judicial Interference with Federal Activities, 51 Columbia L.Rev. 84 (1951); Arnold, The Power of State Courts to Enjoin Federal Officers, 73 Yale L.J. 1385 (1964); 1 Moore's Federal Practice ¶ 0.6[5].

12. Robb v. Connolly, 111 U.S. 624, 4 S.Ct. 544, 28 L.Ed. 542 (1884); Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886); Perez v. Rhiddlehoover, 247 F.Supp. 65 (E.D.La.1965); United States ex rel. Fort v. Meiszner, 319 F.Supp. 693 (N.D.Ill.1970).

In *Fort*, supra, the federal court, citing *Ableman* and *Tarble*, issued an injunction restraining the execution of a writ of habeas corpus ad prosequendum on a federal prisoner temporarily removed from another jurisdiction.

13. "§ 650.30 Securing attendance of prisoner in federal institution as witness in criminal action in the state

1. When (a) a criminal action is pending in a court of record of this state by reason of the filing therewith of an accusatory instrument, or a grand jury proceeding has been commenced, and (b) there is reasonable

state court may issue a writ of habeas corpus ad testificandum *requesting* the Attorney General of the United States to furnish the witness in state court. Although this statute in itself implicitly acknowledges the ineffectuality of state process, further acknowledgement can be found in the accompanying practice commentary. It is there noted that "this section cannot affect the actions of the Federal government in this area, but only gives statutory authority to employ this procedure when Federal officials are willing to cooperate." [14]

The Special Prosecutor seeks to escape the force of the *Ableman* principle by arguing that Leuci's confinement does not constitute a state of custody sufficient to defeat the execution of state court process. He points out, quite correctly, that the phrase "protective custody" is a coinage which cannot be found in the text of §§ 501–504 of the Organized Crime Control Act. This statute, he argues, merely authorizes the Attorney General to provide security for government witnesses; it does not impose on such witnesses a condition of custody within the meaning of *Ableman* and its progeny.[15]

The United States Attorney, in turn, contends that the protection authorized by §§ 501–504 is sufficient to constitute the requisite custody. Alternatively, he notes that although Leuci has not indicated any desire to leave the protection of the federal marshals, were he to do so he would be arrested and arraigned as a material witness pursuant to 18 U.S.C. § 3149.[16, 17] See Bacon v. United States, 449 F.2d 933 (9th Cir. 1971). In either case, it is argued, Leuci is in the effective custody of the United States and thus beyond the reach of state process.

There is ample support in analogous situations for giving "custody" an expansive definition. In Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), the Supreme Court was confronted with the question of whether a parolee was "in custody" within the meaning of 28 U.S.C. § 2241

cause to believe that a person confined in a federal prison or other federal custody, either within or outside this state, possesses information material to such criminal action or proceeding, and (c) the attendance of such person as a witness in such action or proceeding is desired by a party thereto, a superior court, at a term held in the county in which such action or proceeding is pending, may issue a certificate, known as a writ of habeas corpus ad testificandum, addressed to the attorney general of the United States, certifying all such facts and requesting the attorney general of the United States to cause the attendance of such person as a witness in such court for a specified number of days under custody of a federal public servant.

2. Such a certificate may be issued upon application of either the people or a defendant, demonstrating all the facts specified in subdivision one.

3. Upon issuing such certificate, the court may deliver it, or cause or authorize it to be delivered, to the attorney general of the United States or to his representative authorized to entertain the request."

14. See also C.P.L. § 580.30 and the accompanying commentary.

15. See 1970 U.S.Code Cong. and Admin. News, p. 4024.

16. 18 U.S.C. § 3149:
 "§ 3149 Release of material witnesses
 If it appears by affidavit that the testimony of a person is material in any criminal proceeding, and if it is shown that it may become impracticable to secure his presence by subpoena, a judicial officer shall impose conditions of release pursuant to section 3146. No material witness shall be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and further detention is not necessary to prevent a failure of justice. Release may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure."

17. The Special Prosecutor contends that were Leuci arraigned as a material witness pursuant to § 3149, he would be entitled to bail. Were he able to meet the bail fixed, the argument continues, he would at that point be effectively free of federal constraint and thus amenable to state process. In the present posture of the case, that objection is purely hypothetical and one which I accordingly need not consider.

**806**

and thereby entitled to petition for a writ of habeas corpus. The Court, in holding that a parolee was indeed "in custody," stated: "[h]istory, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." The Court found that the regular incidents of the parolee's status, such as confinement to a particular job, community, and style of living, were constraints sufficient to constitute "custody". See also, Donigian v. Laird, 308 F.Supp. 449 (D.Minn.1969); Schlanger v. Seamans, 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971).

▉▉▉ A definition of custody as broad as that evolved in *Jones* would surely encompass the restrictions placed on Leuci's liberty by the federal government here. Yet it can be argued, not without some cogency, that the definition of custody employed for purposes of determining eligibility for habeas corpus relief need not be the same definition used in gauging the reach of state process. Although I do not necessarily accept that argument, I think it proper that I address it nevertheless. The definition of custody here, I submit, must be a functional one: it must harmonize with the principles of federal autonomy developed in *Ableman* and *Tarble*. Of critical importance, then, is the Court's observation in *Tarble* that the state and federal governments constitute "distinct and independent" spheres of authority, and under no circumstances can state court process reach into the federal sphere. The real question before me, then, is not merely whether Leuci's freedom of movement is restrained. Obviously, the protection he requires demands rather elaborate restraints, such as the continuous presence of federal marshals. Rather, one must consider

the degree to which Leuci falls within the sphere of federal authority. If he is indeed within that ambit, the mandate of *Ableman* and *Tarble* requires that he be beyond the reach of state process. Any other result would frustrate the principal of federal supremacy.

▉▉▉ Although I do not pass upon the merits of his position, I am satisfied that the United States Attorney has shown that Leuci's demonstrable relation to the case of United States v. Rosner, noted earlier, makes him an object of continuing federal concern. Leuci was the principal witness at trial, and a challenge to his credibility is the crux of Rosner's new trial motion. The resolution of this question is of vital importance both to the government and Mr. Rosner. Because the United States Attorney is entitled to pursue his ongoing investigation into Leuci's credibility, it follows that Leuci falls within the sphere of federal authority as that term was defined in *Ableman* and *Tarble*. He is therefore beyond the reach of any writ of habeas corpus issued by a state court.

### V.

The Special Prosecutor has suggested several additional bases of state court jurisdiction. All of these contentions are easily met.

▉▉▉ Initially it is argued that the federal court would have the authority to grant the relief requested in this proceeding were it brought in the District Court in the first instance.[18] For this proposition I am directed to 28 U.S.C. § 1361 which confers upon the district court "*original* jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.[19] I fail to see the relevance of this section where it is the state court's jurisdiction which is at issue. Even were I to accept plaintiff's sweeping contention here, a matter of

18. Plaintiff's Supplemental Memorandum, p. 12.

19. Emphasis added.

substantial doubt,[20] it is clear that § 1361 provides no jurisdictional basis for a state court and I likewise derive no authority therefrom under the doctrine of "derivative jurisdiction".

 Plaintiff next refers to New York Penal Code §§ 195.05 (Obstructing governmental administration) and 215.-10 (Tampering with a witness) as "applicable state laws" whose standards have been violated by the United States Attorney's Office.[21] Quite aside from the fact that these are criminal statutes, they are plainly designed to grant the state courts authority to punish the offender, not to order the production of witnesses. They clearly fail to provide any jurisdictional basis for the case at bar.

 The final argument presented by the Special Prosecutor is that both the state and federal courts have "inherent powers" to insure that their proceedings are not interfered with and to supervise the administration of justice. For reasons previously stated I find no need to consider the "original" jurisdiction of the federal court in such matters. With regard to the power of the state court alluded to here, I have been unable to locate any authority for the granting of the relief sought nor has plaintiff directed the court's attention to any statutes or cases in point. §§ 750 and 753 of the New York Judiciary Law, cited in the plaintiff's memoranda, merely grant the state court the power to punish for criminal or civil contempt. Such power would obviously come into play here only after an order of the court had been duly issued and ignored. Contempt is no more than a tool to enforce the authority of the court in matters where it has jurisdiction. To con-

tend, therefore, that the jurisdiction itself is derived from the contempt statute begs the question.

### Conclusion

The Special Prosecutor has failed to allege any jurisdictional basis for the granting of the relief sought. For all of the reasons previously stated, the order to show cause obtained from Justice Murtagh is vacated and the plaintiff's action is dismissed.

So ordered.

---

20. Traditional teaching views mandamus as appropriate solely to compel officials to comply with the law when no judgment or discretion is involved in that compliance (i. e. ministerial duties). Although this principle has been somewhat opened to question in recent court decisions, it remains undisputed that § 1361 only creates a means of enforcing a duty owed to one by a government official and a plaintiff who fails to establish such a duty will be denied mandamus relief by the federal courts. Leonhard v. Mitchell, 473 F.2d 709 (2d Cir. 1973), cert. denied, 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973).

21. Plaintiff's Memorandum, p. 2; plaintiff's Supplemental Memorandum, pp. 2–3.