## In the matter of CHARLES E. HOPSON.

Judges of the state courts have no power to issue a writ of *habeas corpus*, or
to continue proceedings under it when issued, in cases of commitment or
detainer under the authority of the United States.

Thus, where the return to a writ of *habeas corpus* alleged that the defendant
had been duly appointed provost marshal for the 21st district of New
York, under the act of congress of March 3, 1863; that the person alleged
to be illegally detained was arrested as a deserter from the army, by him,
as marshal, and was held in accordance with the act, to be delivered to
the nearest military command or post; and that he was thus held "under
the authority of the United States;" *Held* that the return was sufficient in
law, and that the defendant was not bound to bring the body of the prisoner
before the justice; on the ground that a state court or judge had no juris-
diction to inquire into the fact alleged in said return, that the prisoner
was a deserter.   The writ of *habeas corpus* was accordingly discharged, and
the prisoner was directed to remain in the custody of the provost marshal,
to be dealt with according to law.

In such a case the prisoner is not without remedy.   He may apply to a judge
of the United States courts, for a writ of *habeas corpus*, to ascertain whether

In the matter of Hopson.

he is detained by an illegal or colorable authority, by an officer claiming to act under the laws of the United States. And the judges of those courts have unquestionable jurisdiction to entertain the question, and ample power to afford adequate relief, if a proper case is shown.

LINUS R. HOPSON presented a petition to Justice BACON, for a writ of habeas corpus in behalf of Charles E. Hopson, in which he alleged that the said Charles E. Hopson was restrained of his liberty and detained by Joseph P. Richardson, United States provost marshal for the 21st congressional district of New York, acting at Utica, N. Y. That the said Charles E. Hopson was not committed or detained by virtue of any process, judgment, or decree or execution issued by any court of the United States, or any judge thereof, or by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or by virtue of any execution issued upon such judgment or decree. That said Charles E. Hopson was restrained of his liberty and detained by reason of his having, as was alleged, volunteered upwards of two years since in one of the companies comprising the former 14th regiment of New York state volunteers, which regiment had been discharged from the service of the United States, and which, some time since, ceased to be a regiment. That said restraint was illegal in that said Charles E. Hopson, as the petitioner was informed and believed, never was a duly enrolled volunteer, nor was he ever duly mustered into the United States service, and was no way liable as a volunteer in the said service of the United States, or otherwise.

The petitioner further showed that he was the father of said Charles E. Hopson, and the said Charles was an infant under the age of twenty-one years.

The said justice thereupon, pursuant to the prayer of said petition, ordered and allowed a writ of habeas corpus to issue to said Richardson, commanding him to have before him the body of the said Charles E. Hopson, together with the time and cause of his detention, at his chambers, in Utica, on the

23d day of July, 1863, at three o'clock P. M.; at which time and place it was duly proved before the justice that said writ had been duly served on said Richardson, at Utica; and at the time and place last named the counsel for the said Hopson appeared before him, and the said Richardson appeared before and delivered to him, as and for a return to said writ of habeas corpus, a paper in which he returned and answered.   1st. That he had been duly appointed United States provost marshal of the 21st congressional district of New York by the president of the United States, in accordance with the provisions of the act of congress passed March 3d, 1863.   That Charles E. Hopson, a deserter from the army of the United States, was arrested by his agent and by his direction on the 22d day of July, 1863, at Sherburne, in the county of Chenango, and was then held by him as marshal aforesaid, in accordance with the provisions of the seventh section of the act aforesaid.   2d. That it was the legal duty of the respondent to deliver over the said deserter to the nearest military commander or military post, and that the respondent intended to perform said duty as soon as possible.   3d. That the production of said deserter in court would be inconsistent with, and in violation of the duty of, the respondent as provost marshal, and that the said deserter was then held under authority of the United States.   For these reasons, and without intending any disrespect to the honorable judge who issued the process he declined to produce said deserter, or to subject him to the process of the court.   And he stated that the law govering the instructions furnished him by the provost marshal general, and controlling his action in this and like cases, might be found in the language of Chief Justice Taney, in the decision of the supreme court of the United States, in the case of *Abelman* v. *Booth*, (21 *How. Rep.*)

And the said Richardson declining and refusing to produce and bring before the justice the body of the said Charles E. Hopson, as he was commanded to do in and by said writ, or

In the matter of Hopson. •

to make any other or different return thereto, as aforesaid, an attachment was issued against him.

And upon the application of the said Richardson, it was ordered that he have leave to be heard by counsel, and that the claimant show cause before the justice why the return made to said writ should not be held sufficient in law, and why the order made *pro forma* for an attachment should not be vacated.

Pursuant to this order, the counsel of said Richardson and said Hopson, respectively, were heard before the said justice on the seventh day of August, 1863.

*F. Kernan,* for the applicant.

*R. Conkling,* for the provost marshal.

BACON, J. The question presented and arising upon the return to the writ of habeas corpus issued by me in this case, is admitted to be one of very great interest and grave importance. It involves an apparent if not a real conflict of jurisdiction between the state and national tribunals, and demands serious and careful examination and a calm and enlightened judgment. Until this case reached that stage where the question could be discussed in the light of principle and authority, any opinion expressed in the matter must of necessity have been hasty and in a measure unsatisfying. It was so here, and was so regarded by me, although with the impressions originally entertained, I had no hesitation in making the order I did in this case, upon the return to the writ when first presented.

On the 23d of July last, a petition was presented to me on behalf of Charles E. Hopson, setting forth in substance that he was restrained of his liberty and detained by Joseph P. Richardson, U. S. provost marshal for the 21st congressional district of New York, and that the alleged cause was his having enlisted as a volunteer, &c., but that he was never

duly enrolled, or mustered into the service of the United States. There was no allegation in this petition that he was claimed to be held as a deserter. Upon this petition I allowed a habeas corpus in the usual form, as prescribed by the statute, returnable in the afternoon of the same day at chambers. At the designated hour the petitioner and the provost marshal appeared, and the latter returned in substance that he was duly appointed to the office above named pursuant to the act of congress of March 3d, 1863; that Hopson had been arrested as a deserter and was held by him in accordance with the 7th section of that act, to be delivered to the nearest military commander or post; that the production of such deserter would be a violation of his duty as marshal, and he therefore declined to produce, or subject him to the process of the court. Upon the reading of this return it seemed to me, I confess, by a sort of judicial instinct, to be insufficient. The proceeding by habeas corpus had become so common, it had been so uniformly obeyed by the production of the prisoner, and I had myself, in common with scores of other judicial officers, so often had alleged volunteers brought before me, and inquired into the validity of the enlistment, that it did not occur to me that a case existed, or could arise where the mandate of the writ to produce the body and set forth the cause of the detention, (save in cases expressly excepted by the statute,) could legally be disobeyed.

Upon a suggestion that if opportunity were given to obtain counsel, the provost marshal might deem it expedient to produce the prisoner, the matter was adjourned over to the ensuing day, at which time that officer again appeared, and having obtained no farther advice, owing as was said, to peculiar circumstances, elected to stand upon the return already made, and make no further return, and declined to produce the prisoner. No argument was had, and I had bestowed no special thought on the case, or the question presented by the return. I had never before seen the instruc-

tions of the provost marshal general, and although I retained a general recollection of the case of *Ableman* v. *Booth* in the supreme court of the United States, my decided impression then was that the principle of that case could not be so extended as to embrace this. Without further deliberation then, I decided at once to make an order for an attachment, pursuant to the statute, but upon a suggestion promptly and courteously assented to by the counsel for the petitioner, the attachment was only issued *pro forma,* with no expectation or desire indeed that it should be rigidly enforced, and with the implied understanding that the matter would in some way come up again before me for further consideration, or measures be taken to obtain the judgment of some ulterior tribunal either of the state or of the United States.

As the simplest and most obvious mode of again presenting the question for the discussion and examination I desired, I granted an order to show cause, returnable on the 7th of August, before me, at chambers, why the return made by the provost marshal should not be held sufficient, and the order for an attachment vacated and discharged. Upon the return of this order, I have been attended by counsel for both parties, and have heard an extended and elaborate argument, and have now all the aids to a just decision that further reflection and the researches of diligent and able counsel can afford me. With these lights and assistances, and with a mind uninfluenced by any desire except to perform my whole judicial duty, and unbiased save only by the impression originally existing, and which I now find it somewhat difficult to hold in abeyance, I proceed to examine and dispose of this case.

The learned counsel for the petitioner urges three grounds upon which he argues the insufficiency of the return.

1st. That the return is technically insufficient and defective in not averring affirmatively that the prisoner is held as a deserter.

2d. That he is not alleged to be held by any process of any

court, or the action of any authorized legal tribunal, and no process is set forth by which he is claimed to be held.

3d. That the body of the prisoner is not produced under the writ, and without this, there is no obedience to its mandate.

These propositions have been expanded and elaborated by argument, the whole discussion, however, after all, terminating in the question whether there has been a prior and paramount exercise of authority by an officer of the general government, under the authority of the United States, by which the prisoner in this case has been withdrawn from the jurisdiction to which by the writ of habeas corpus he was sought to be subjected.

Upon the first of these grounds, I deem it only necessary to say that although the return in the respect alluded to is not very artificially drawn, yet, as I construe it, it does in effect allege the fact of desertion, and specifically makes the claim to hold the prisoner as a deserter. It was so treated when originally presented, and that claim was distinctly understood to be made. But the point is not of much moment, since the return is susceptible of amendment, which can be made, according to the practice in this country, at any time before the case is finally disposed of. (*Hurd on Habeas Corpus*, 262.) It may accordingly be now deemed amended, by adding words which shall affirm the fact that the prisoner is now, and was at the time of the issuing of the writ, held as a deserter from the service of the United States.

The second and third propositions may be considered together, and are indeed necessarily involved in the discussion of the main question, whether this return is sufficient to excuse the provost marshal from any further obedience to the writ than he has rendered by the return, and whether the facts set up therein foreclose any further proceeding under the writ, and transfer the subject to another jurisdiction. The writ of habeas corpus is a very ancient remedy, known to the common law of England many centuries before any legislative provisions were enacted to give it larger scope,

In the matter of Hopson.

and create fuller protection to the people. It very probably had its origin in that glorious declaration of *"Magna Charta"* extorted from the sovereign by the Barons at Runnymede *"nulli vendemus, nulli negabimus, nec differemus rectum aut justitiam"*—for whether, says a learned historian, "Courts of justice framed the writ of habeas corpus in conformity with the spirit of this clause, or found it already in the register, it became from that era the right of every subject to demand it." The privilege of this great writ of liberty was a part of the inheritance derived by us from our British ancestors, and has ever been held by us as by them, in high veneration. Our statute in relation to "writs of habeas corpus and certiorari" when issued to inquire into the cause of detention, provides in broad terms that every person committed, detained, or restrained of his liberty upon any criminal, or supposed criminal matter, *or under any pretense whatever*, except in certain enumerated cases, may prosecute the writ. By another section it is made the duty of the person against whom the writ is issued to bring the body of the person in his custody according to the command of the writ, before the officer issuing it; and he is also to make a return of the true cause of the detention, and if by virtue of any process or written authority, a copy must be annexed to the return, and the original produced to the court or officer before whom the writ is returnable. If there be, then, any process or written authority, the same must be stated and exhibited. In this case there is none alleged and none is claimed, or understood to exist, having the nature or characteristics contemplated by the statute. The justification is directly under the authority and by virtue of the power of an act of congress bearing specifically on the subject. We are to examine, subsequently, whether this is a sufficient immunity to the officer, and clothes him with adequate powers.

The production of the person is also an explicit command of the writ, and, as the elementary writers generally state it,

constitutes an essential element of the proceeding. It is so, beyond all question, where jurisdiction is entertained of the case; for, without the presence of the prisoner, the case, say the supreme court of Massachusetts, (11 *Mass.* 93,) has no *status*, and the court will hear no evidence upon the question of the validity of the imprisonment. But unless the case is entertained, and the cause of the detention is to be investigated, it is very obvious that the presence of the alleged prisoner is of no sort of consequence. Such are the cases specifically excepted by the statute, to wit: where the person is held by a process issued by any court or judge of the United States in a case where such court or judge has exclusive jurisdiction; or by virtue of any final decree, or judgment or execution of a court of competent jurisdiction; or for any contempt charged in the commitment by any court having authority to commit. Other matters also excuse from the production of the body, such as want of custody or disability arising from sickness, &c. Indeed, it is expressly held that "although the body of the prisoner is usually returned with the writ, the reasons of the prisoner's detention are, however, sometimes returned *without actually bringing up the prisoner*, as where he is charged with treason or felony, clearly expressed in the warrant, or imprisoned for an civil cause of action, or in execution, but the return must show by whom and for what cause the prisoner was detained." (*Hurd*, 264.)

It this case, therefore, although I confess the non-production of the body struck me at first as an anomaly, and an actual disobedience to the writ, without right and without excuse, yet if the justification on the return is sufficient to hold the prisoner, and no inquiry could be made into the cause of the detention, even if he were personally present and before the court, it is manifest that his corporeal presence and actual production is of no consequence whatever. It is at most a formal and technical disobedience only, working no injury to the prisoner and depriving him of no benefit

to which he is entitled on the hearing before the officer issuing the writ.

We are now prepared to discuss the question which embraces all there is of this case, and upon which its decision wholly hinges, to wit: will the state courts entertain or continue jurisdiction of a case where a person is claimed to be held under the authority of the United States, and where he was so held at the time of the issuing of the process of the state court? I state it in this as the strongest form in which it can be enunciated, without reference to the particular tribunal, or the form in which the authority is embodied, or the character of the process, if any, by which the caption has been made. We shall see in the sequel how broadly the proposition can be maintained, or what qualifications, if any, it requires. .

It may be remarked preliminarily that there is no issue here on the truth of the facts set forth in the return. Until controverted the return is to be assumed as true, and the question comes up substantially as if the relator had demurred to the sufficiency of the return in law, which, of course, always concedes the facts to be as they are averred. The return then affirms that the defendant has been duly appointed provost marshal for the 21st district of New York, under the act of congress of March 3, 1863; that Hopson, as a deserter from the army, was arrested by him, as marshal, on the 22d of July, and is held, in accordance with the act, to be delivered to the nearest military command or post, and that he is thus held "under the authority of the United States."

It would seem a little remarkable, that the question whether the judges of the state courts have power to issue a writ of habeas corpus, or to continue proceedings under it when issued, in cases of commitment or detainer under the authority of the United States, had not long ago been definitely decided, and the precise line of limitation, the nature of the process by which an arrest is made, or a detainer is continued,

or whether any in fact is necessary, had not been defined. The question has indeed often been debated in the state courts, and, to some extent, in the tribunals of the United States, but a precise case covering all the ground embraced by the one now before me will not, probably, (with perhaps a single exception) be found. The principle which underlies it may, and I think will be, discovered in the celebrated case to which I shall allude hereafter, and which formed the ground-work of the direction under which the provost marshal, in this instance, proceeded. It may not be altogether useless or uninstructive to glance at the state of the question as it is presented by several adjudications made at various periods by the state courts, and note the character of a few of the decisions. It will be found to be a singular fact, that in some of the extreme southern states the power to interfere with the action of the United States had been repeatedly disclaimed, while in some of the northern states, and particularly in Pennsylvania and in Massachusetts, "reproached, obnoxious, but ever loyal Massachusetts," it has been strongly maintained.

In Georgia a case involving this question arose in 1807. A writ of habeas corpus appears to have been issued by some judge, to bring up two seamen who had been arrested for desertion, by a justice of the peace, under an act of congress. From the statement of the case it does not distinctly appear whether this arrest was made by any process issued by the justice, or was a manual caption simply under the authority of the act. A motion having been made for their discharge, the judge said, "The proceeding of the justice appears to be regular under the act, and although this court has not denied the benefit of the writ of habeas corpus, yet it is conceived *that it possesses no jurisdiction in the present case.* The powers given to the justice are derived from the laws of the United States, and whether used properly or improperly, is not a subject for the investigation of this court.

---

In the matter of Hopson.

---

In Maryland the case of Emanuel Roberts arose in 1809. He was brought up before Judge Nicholson upon a habeas corpus, the petition alleging that he had been seized and carried forcibly aboard a vessel lying in the harbor of Baltimore. The return stated, and the fact was shown, that he had voluntarily enlisted in the service of the United States, and received three months wages in advance. It was then proposed to be proved that Roberts was only sixteen years of age and was intoxicated when he enlisted. The judge declined to go into the inquiry on the ground, in part, that the government could not be summoned into court to have the nature of its contracts of enlistment inquired into, and he concluded by saying, "here the whole proceeding *is under the constitution and laws of the United States.* I am, therefore, decidedly of opinion that this court has no right to interfere in the present case." The process of reasoning in the case is not perhaps very satisfactory, but in the conclusion, the principle upon which it seems to have proceeded is stated in precise and emphatic terms. The decision is cited by Chancellor Kent as one determining against the jurisdiction of a state court where the authority of the United States is interposed, as it was in that instance.

But what is quite remarkable is, that this power to interfere has been disclaimed in South Carolina, the very hot-bed where the extreme doctrines of state independence and state sovereignty have had their rankest growth, perpetually cropping out in acts not of infidelity merely, but of open hostility to the general government, and culminating at last, as was long ago foreseen and predicted by the wise and honest statesmen of our country, in the horrible and accursed rebellion which has deluged the land in blood, and sent mourning and desolation to thousands of happy households throughout all our borders. In 1819, a prisoner was arrested by a warrant from a justice of the peace, in South Carolina, on the charge of counterfeiting protections to seamen, in violation of the laws of the United States. On being brought before

Judges Cheves, it was insisted that the magistrate had no power to commit, because the section of the act of congress which conferred such power was unconstitutional. But the judge held that he had no jurisdiction over the case; that criminal jurisdiction under the laws of the United States was necessarily exclusive, and as a state court he would not take cognizance of the matter, under a habeas corpus, nor declare an act of congress unconstitutional and void. The latest decision denying jurisdiction in the state courts has been made by the supreme court of the state of Michigan. It holds clearly and strongly, that a state judge has no power to discharge upon a habeas corpus a person held by the draft commissioners simply under the authority of the act of congress authorizing the draft. (*In re Spangler. Am. Law Reg. for Aug.* 1863.)

On the other hand, very strong and emphatic opinions have been given, and decisions made in Pennsylvania, New Jersey and New Hampshire, and, I presume, in other of the northern states, upholding the power of the state courts to inquire into detention claimed to be made by the authority of the United States.(*a*) It is not necessary to allude to them in detail, because it is conceded that they maintain the power to the fullest extent that can ever be claimed for it. In Massashusetts, also, the same doctrine has uniformly prevailed, although it is perhaps remarkable that in the celebrated case of Sims, the supreme court, sitting in bank, refused to grant the writ of habeas corpus. They allowed the question of the constitutionality of the fugitive slave law of 1850 to be argued at length, and, indeed, the decision

(*a*) Since this opinion was prepared my attention has been directed to the fact that in several quite recent cases in New Jersey decisions have been made denying the state jurisdiction in cases of this character. The latest reported case is *The State* v. *Zulick*, (5 *Dutch.* 409,) which is a clear and precise authority holding the ground maintained by me in this opinion, and this doctrine is now understood to be generally if not univerally concurred in in the state of New Jersey

In the matter of Hopson.

seems to have proceeded upon an affirmation by the court of the validity of that law. The very able and learned Chief Justice Shaw, in the course of his opinion, (7 *Cush.* 285,) suggests the question how far it was competent for that court, by a writ of habeas corpus to the marshal, to take a prisoner from the custody of another tribunal, court, or magistrate, of which the marshal is the executive officer, and after he has been placed under the control of the magistrate. It was evidently an embarrassing question, and was only avoided by considering what seems to have been the over-ruling inquiry into the constitutionality of the fugitive slave act. On the question suggested by him he merely says: "We do not mean to say that this court will in no case issue a writ of habeas corpus to bring in a party held under color of process of the courts of the United States, or whose services and the custody of the person are claimed under authority derived from the laws of the United States." But he adds, "It is manifest this ought only to be done *in a clear case*, and where it is necessary to the security of personal liberty from illegal restraint."

It has been sometimes claimed that the question of the constitutionality of a law of the United States is one that belongs specially and, indeed, exclusively to the judicial tribunals of the union, and that when presented in a state court, or in a proceeding therein instituted, it is not to be entertained, but remitted in some form to that ultimate and superior tribunal. No doubt the decision of this last tribunal is the only one that carries with it a final and conclusive sanction; but it is inevitable that such questions should, at least incidentally and collaterally, arise in the state courts; and in some cases, (as, for instance, the recent cases in which are involved the taxing power of the state in reference to government stocks and the legal tender causes,) the constitutional question is the paramount, if not the only one presented for adjudication. I may remark, however, in passing, that no such question has been made or argued before me as

to the validity of the law under which the provost marshal here professed to act. I am aware that the argument most in vogue in these days is that which professes to deal with the constitutional power to enact laws unwelcome in certain quarters, and offensive to the sensibilities, or at war with the supposed interest or convenience of individuals. Such questions are argued by bar-room Solons and pot-house Justinians at the corners of the streets, with as much zeal and pertinacity as by governors in their chairs of state, and with about as large a claim to consideration or authority in the one case as in the other. But no respectable counsel will be found to argue that, under a constitution which gives to congress the power "to raise and support armies," it has not the necessary and incidental power to maintain the discipline and preserve the existence of these armies, by dealing in the most effective and summary way with the whole matter of desertion, and providing in the most stringent, direct and forcible manner for the arrest, detention and punishment of deserters. The law in that branch of it under which the proceedings of the provost marshal was taken, as to its constitutional validity, has not in this discussion for a moment been brought in question.

The condition of the law in this state on the subject of jurisdiction we have been discussing, cannot be deemed to be very satisfactory. In the earliest case reported (*In re Husted*, 1 *John. Cas.* 136,) the supreme court held that a state court had no jurisdiction to discharge on habeas corpus a soldier claimed to belong to the army of the United States, but the question was not discussed at any length. A few years later, however, (in 1812,) the case of Ferguson arose, reported in 9 *John.* 239. The case is remarkable as containing an elaborate and able argument of Kent, then chief justice, wholly denying the jurisdiction of the court to entertain the application. The petition was addressed to the full bench of the supreme court, and set forth that Ferguson was held by one Christie, an officer in the army of the United

States, as an enlisted soldier, but that in fact he was only of the age of seventeen, and was enlisted without the consent of his father, and praying that a writ of habeas corpus might be issued to bring him before the court, to the end that he might be discharged. Kent argues the question mainly on principle, referring only to the single case of Roberts which had been decided in Maryland. He says, in substance, that the case being one of enlistment *under color of authority of the United States,* and by an officer of that government, the federal courts have complete and perfect jurisdiction, and there is no need of the jurisdiction of the state courts; that the judicial power of the United States is commensurate with every case arising under the laws of the union, and that if a court has no jurisdiction of the principal question it has none of its consequences and incidents. He puts a case as follows: "Suppose the marshal should confine a person in prison under color of process, when it could be shown to the court that the process was void, or that the arrest was after the return day, would a state court undertake to deliver a party from the marshal's custody? I presume not; and yet I see no reason for any distinction *as to the question of jurisdiction* between that case and the present. The detention in each case is by an officer of the United States under color of its authority."

It is true that the other judges did not express their assent to the course of reasoning, but reserved themselves on the question of exclusive jurisdiction, but they all concurred in refusing the writ on the ground that granting it rested in sound discretion, and because the party could have relief by applying to a judge of the United States, whose jurisdiction was unquestionable. The argument of Kent is only important, because no judge in this state has undertaken to answer it, and it is the opinion of one of the purest and soundest jurists of his own or any other age.

*In the matter of Stacy,* (10 *John.* 328,) the question of jurisdiction did not arise, or at least was not made. It was

purely the question of an evasive return made to a writ of habeas corpus by General Morgan Lewis, and that was the only point involved in the case.

In the case of *Carlton*, (7 *Cowen*, 471,) the supreme court did assume jurisdiction in a case where an application was made to discharge a minor from an enlistment, but the discussion is the briefest possible and seems to have proceeded upon the ground of the common law right to demand the writ, of which no act of congress had forbidden the exercise by any state court. Thus stands the law in this state, and since this decision it is undoubtedly true that as a general rule courts and judges have issued writs of habeas corpus to inquire into the validity of enlistments, and questions of jurisdiction have not been discussed, because in the practice, so far as I have had experience and knowledge, the question has not been raised. If it had been it would perhaps have been much more serious than has been generally supposed, and the case of an arrest for desertion from the army, where the party is actually in custody, charged with an offense against the government, and in the hands of one of its officers, presents a question quite in advance of a simple inquiry into the validity of a contract of enlistment.

One more remark may here be indulged in reference to the doctrine of Kent, that where the federal courts have complete jurisdiction, there is no need of the interference of the state courts, and it should de declined even if it is not absolutely excluded. In the opinion given by Chief Justice Shaw of Massachusetts, in the case of Sims, he takes substantially the same view. He says: "It seems to be the less necessary to call into action the powers of the state judges in a case like this, because it is quite competent for the judges of the United States to bring the prisoner before them by habeas corpus, and ascertain whether he is detained by an illegal or colorable authority by an officer claiming to act under the laws of the United States. This consideration is only important as showing that there is no necessary

In the matter of Hopson.

occasion for drawing the authority of the state and the United States judiciary into conflict with each other. All judges of all courts are obliged to act upon the same principles and be governed by the same rules of duty." These are sound and judicious sentiments, and in the light of them I might well hold that in declining to proceed in this case I should not necessarily abdicate the power which might be claimed to exist in the state courts, but only affirm the prudence and propriety of abstaining in this case from insisting on its assertion, and leaving the petitioner to make application where there is unquestionable jurisdiction to entertain the question, and ample power to afford full and adequate relief if a case is shown that entitles him to demand it.

But although this consideration might be sufficient to justify me in declining to proceed farther, and in dismissing the writ, I do not care to rest the case on that ground, persuaded as I am that I could not overrule this return, and order the defendant into custody for refusing to obey the mandate of the writ, without an invasion of the paramount authority of the constitution and the laws of the United States, which by that constitution are declared to be the supreme law of the land, and setting at naught the principles enunciated by the judicial authorities of the union, and particularly embodied and set forth in language used by the chief judicial officer of the government, concurred in by all his associates, and constituting in the highest sense the law to which we have all been taught to defer.

It is a matter of notoriety that in the district courts of the United States the jurisdiction of a state court to discharge on habeas corpus a soldier or sailor held under a law of the United States has generally if not uniformly been denied. Indeed, I know of no case in these courts which has ever affirmed the existence of such a power in the state courts. I do not cite these cases, as they are not of controlling authority, but I may be allowed to allude more particularly to the declarations made in judicial proceedings by

two eminent judges of the supreme court of the United States, because coming from such a quarter opinions deliberately formed and expressed carry weight from the official position of those uttering them. In April, 1851, Judge Nelson had occasion to address a charge to a grand jury at the circuit court for the southern district of New York. In this charge he discusses the power of state tribunals to inquire into the legality of a commitment or detainer by authority of an officer of the general government. The right to issue the process of habeas corpus, he states, is not questioned, and it is the duty of the officer to whom it is directed to obey the writ *by making a return.* But when it is shown that the commitment or detainer is under the constitution, or a law of the United States, or a treaty, the power of the state *is at an end,* and any further proceeding under the writ is *coram non judice* and void; and under such circumstances it is the duty of the officer not to give up his prisoner, or allow him to pass from his hands in any stage of the proceedings.

In the case of *Morris* v. *Newton,* (5 *McLean,* 92,) Judge McLean expressed himself in equally strong language, and in a case where the only authority to retain the party seems to have been the certificate of a magistrate under the fugitive slave act of 1793, that proof had been made before him authorizing the recaption of the alleged slaves. The judge says that this fact having been stated as the cause of and warrant for the detention, would have terminated the jurisdiction of the state judge under the writ. "It would thus appear," he says, "that the negroes were *under federal authority,* which in this respect is paramount to that of the state. The cause of detention being legal, no judge could arrest, and reverse the remedial proceedings of the master, and every step taken subsequently was against law, and a violation of his rights." It is impossible to employ language which can enunciate in terms more clear and emphatic, a

In the matter of Hopson.

proposition broadly covering every feature presented by the case now before me.

We come now to consider the case of *Abelman* v. *Booth*, (21 *How.* 506,) a case very liable to be misunderstood and misapplied, and the full purport of which was at first misconceived by me, and has been, I think, by others. It was unfortunate, in my judgment, that the court undertook to decide two cases in one. The result has been that by mingling the two, the facts of each have not been carefully discriminated, and it requires an effort of attention, at least, to determine how far the court intended to go in the application of the general principles which are clearly and incisively enunciated in the opinion. In the first of these cases, Booth had been arrested by the United States marshal upon a warrant issued by a commissioner under the fugitive slave act, charging him with the offense of aiding and abetting the escape of a fugitive slave, and upon that warrant he was held in custody. While thus held, a justice of the supreme court of Wisconsin issued a writ of habeas corpus directed to the marshal, requiring him to produce the body of the prisoner, with the cause of the detention. The marshal made a return that he was held by virtue of the warrant of the commissioner, a copy of which he annexed to his return. Upon argument and a demurrer to the return, the judge held the detention to be illegal, and Booth was discharged from custody. Upon this decision the marshal sued out a certiorari and removed the case into the supreme court, where upon argument, the decision was affirmed. It proceeded upon the ground that the fugitive slave act was unconstitutional, and that consequently the marshal had no authority to make the arrest and hold the defendant in custody.

In the second case, Booth had been indicted for the same offense with which he had previously been charged before the commissioner, been tried and convicted in the United States district court for Wisconsin, and sentenced, and was

in execution upon the judgment. Thereupon another writ of habeas corpus was issued by the supreme court sitting in bank, upon a petition setting forth among other things that the conviction was illegal by reason of the invalidity of the act under which he was indicted, tried and convicted. The return of the sheriff consisted of a transcript of the proceedings, judgment and sentence of the district court, and stated that to be the authority and process by which the prisoner was held. The court heard the argument, and decided the imprisonment to be illegal, and ordered Booth to be at once discharged, which was accordingly done. Upon both these decisions writs of error were prosecuted to the supreme court of the United States, both cases were remanded to the court, and both were argued at the same time, and but one decision rendered covering the two cases.

The chief justice in his opinion, after recapitulating the facts, stated the points presented by each, as follows: "It will thus be seen that a judge of the supreme court of Wisconsin in the first of these cases, claimed and exercised the right to supersede and annul the proceedings of a commissioner of the United States, to discharge a prisoner who had been committed by the commissioner for an offense against the laws of the government, and that this exercise of power was afterwards sanctioned and affirmed by the supreme court of the state. In the second case, the court has gone a step further, and claimed and exercised jurisdiction over the proceedings and judgment of a district court of the United States, and upon a summary and collateral proceeding by habeas corpus, has set aside and annulled its judgment and discharged a prisoner who had been convicted and sentenced to imprisonment by the district court."

The chief justice then proceeds in a clear and masterly argument to show the supremacy of the constitution and laws of the United States and of its judicial tribunals acting within their acknowledged jurisdiction, over all state constitutions, laws and tribunals. It was necessary, he says,

that many of the rights of sovereignty which the states possessed, should be ceded to the general government, and that "in the sphere of action assigned to it, it should be supreme and strong enough to *execute its own laws by its own tribunals,* without interruption from a state or from state authorities." And this supremacy thus conferred could not be maintained unless it was clothed with judicial power equally paramount in authority to carry it into execution. The same language which gives supremacy to the constitution, makes the laws equally supreme, for it is expressly provided that "this constitution, and the laws of the United States which shall be made in pursuance thereof, shall be the supreme law of the land, and the judges of every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."

No lawyer at this date will for a moment question the utter incompetency of a state court to sit in judgment upon, and review and reverse a solemn adjudication of a court of the United States. It hardly required the learned argument of the chief justice to establish this proposition, which since 1830 at least, and I think long before, has been all but universally conceded. It was the other proposition, to wit, that it is equally incompetent for a state court or judge, by a writ of habeas corpus or otherwise, to take a party out of the hands of an officer, held by him under the authority of the United States, whether retained by judicial process in the strict sense of that term, or simply by authority of law, that was sought to be and is established by that decision, if any effect is to be given to language clear and well defined as that used in the opinion is.

It is very manifest that the reporter understood the decision as going to this length, for in the brief and condensed, but clearly expressed marginal notes, the following propositions, among others, are affirmed to be established, to wit:

"1st. The process of a state court or judge has no author-

ity beyond the limits of the sovereignty which confers the judicial power.

2d. A habeas corpus issued by a state judge has no authority within the limits of the sovereignty assigned by the constitution to the United States.

3d. When a writ of habeas corpus is served on the marshal, or other person having in custody a prisoner under the authority of the United States, it is his duty, by a proper return, to make known to the state judge or court the authority by which he holds him; but at the same time, it his duty not to obey the process of the state authority, but to obey that of the United States."

When we turn to the opinion of Chief Justice Taney to see where these propositions are advanced, we find them there in the most unmistakable terms. This branch of the case, and the questions presented thereby, which arose in the proceeding of *Booth* v. *Abelman*, are discussed near the close of the opinion, and nothing can be more precise and pronounced than the language used by him to define the limits of the state jurisdiction and the duty of the officer of the United States, who is sought to be subjected to it. He says distinctly that after a return is made showing that the person is in custody "under the authority of the United States," the state court or judge is then judicially apprised of this fact, and can proceed no farther. "If the prisoner has committed an offense against the laws of the United States, the tribunals of the government alone can punish him. If he is unlawfully imprisoned, their judicial tribunals can release him and afford him redress. * * * * It is the duty of the officer not to take the prisoner, nor suffer him to be taken, before a state judge or court upon a habeas corpus issued by state authority."

The doctrines thus laid down as the law of that case by Chief Justice Taney, seem to me entirely decisive of this. If there is any difference in principle I am unable to see it. Will it be said that in that case the prisoner was held by

In the matter of Hopson.

judicial process, issued by an officer of the law, and clothed with judicial functions? I deny that the commissioner was in any sense a judicial officer, or if he was, that his warrant partook in any respect of the nature of a judicial process. He had passed no judicial judgment, he had exercised no judicial function. The warrant issued by him was merely the formal authority by which another officer was directed to effect the arrest, and to deliver over the prisoner to be thereafter dealt with according to law. It was a ministerial, not a judicial act. It will not, I apprehend, be claimed that it was clothed with any superior solemnity or any higher character than the writ of habeas corpus which in this very case I issued to bring before me the provost marshal to answer why he had deprived of liberty a citizen of this land. And yet, in entertaining the application, and directing the writ to issue I was executing no judicial function whatever, but discharging a merely ministerial office. So it was long ago held in *Yates* v. *Lansing*, (5 *John.* 282,) a decision recently repeated and reaffirmed by the general term in the first district.

The case in principle would have been precisely the same if the marshal had arrested Booth without any warrant as with it. The warrant was the mere machinery by which he was subjected to the action of a tribunal charged with executing the law, or rather punishing for its violation. Is that of higher validity than the act of congress that defined and created the offense? Here the law in one sense is self-executing, or rather acts directly on the subject by authorizing the officer *ex proprio vigore* to make the arrest, instead of creating an intermediate agency by which, on application, a formal warrant or process might be issued, clothing the officer with a paper or parchment authority deriving its whole vitality from the law itself. The act of congress for enrolling and calling out the national forces, &c. provides, among other things, that for the purpose " of arresting deserters and spies of the enemy," the United States shall be divided into

convenient districts ; that for each of these districts a provost marshal be appointed, and to be under the direction and subject to the order of the provost marshal general, whose duty it shall be, among other things, to make rules for the government of his subordinates, " to furnish them with the names and residences of all deserters from the army or any of the land forces in the service of the United States, when reported to him by the commanding officers ;" and then by the 7th section of the act, it is made the duty of the provost marshals " to arrest all deserters *wherever they may be found,* and send them to the nearest military commander or military post," for the purpose of course of trial and punishment by the proper authorities.

The act, then, it will be seen, creates the office of provost marshal, defines his duties in reference to this subject, and clothes him with express and specific power, or rather commands him by its own potent voice to execute the duty of making the arrest and delivering over the alleged criminal. It requires no other machinery, it invokes no other agency to perform the duty than the law itself. It is the sovereign will embodied in the law, which, in the highest sense of the term, is process. It was forcibly argued by the counsel for the defendant, that the authority to create courts is precisely the same as the authority to pass laws. The constitution and laws made in pursuance of it are the supreme law of the land, and this is supremacy above courts, or any other agencies for the execution of law, and consequently, if a law pursuant to the constitution empowers and directs an officer to do a given act, his authority is as high and as perfect as judicial process can possibly make it. This reasoning seems to me to be unanswerable, and the consequence appears to follow legitimately from the doctrines laid down in *Abelman* v. *Booth,* that the arrest of the prisoner here was under and by virtue of the authority of the United States, for an alleged offense against the government, and that the prisoner being thus held before the issuing of the writ of habeas corpus, the

In the matter of Hopson.

return made by the provost marshal was a proper and legal return, and that, in the language of Chief Justice Taney, he only discharged his duty, after making the return, by "obeying the process of the United States holding the prisoner under it, and refusing obedience to the mandate or process of any other government." The jurisdictional fact is not whether an offense has been committed, but whether such is the claim by the party first making the arrest and holding the prisoner. If so, jurisdiction attaches to this tribunal and the other is excluded.

All this seems to me to follow logically and inevitably from the decision of the supreme court of the United States in this memorable case — a case memorable in this, that while it doubtless was not made under the influence, yet it enured to the benefit of that dark and overshadowing power which for more than half a century had ruled the government with an iron hand, but whose days are now, in the good providence of God, and under the impulse of its own mad ambition and blind infatuation, already numbered and apparently hastening to their close. And thus it ever is that the divine Nemesis of history, following with noiseless tread upon the pathway of the persecutor and the oppressor, "with a step steady as time and an appetite keen as death," at the appointed and ordained moment turns against the heart of the man-slayer the edge of the very sword with which he sought the life-blood of his victim.

Here I terminate the discussion, having protracted it, indeed, to a tedious length and much beyond my original purpose. It has conducted me to a conclusion the opposite of my first impressions, but as it has been the result of the "sober second thought," aided by full and elaborate argument, I rest upon it with the more satisfaction, inasmuch as it terminates in a conviction of the rightfulness of that conclusion, clear and decided. I shall be happy if it shall be concurred in by my brethren of the judiciary of the state ; but, if otherwise, I shall regard any dissenting views with

entire respect, according to them the same consideration I ask for my own, as being the result of a judgment honestly exercised, and a conviction reached in the utmost sincerity.

I am not unaware that these views will expose their author to severe, perhaps to unfriendly criticism. It may be said that I have been too ready to sacrifice state dignity and judicial independence at the shrine of a grasping national supremacy that seeks to override the authority of state tribunals, to break down all protection to individual freedom, and found upon the shattered fragments of state sovereignty a great central despotism, and that all our cherished rights and liberties are in imminent jeopardy from this growing and continually encroaching power. These views are, I doubt not, sincerely and conscientiously entertained by a great many honest, patriotic and loyal men. I respect their sincerity, while I do not partake of their fears. On the other hand, I am persuaded that with a large number of those who unite in these expressed apprehensions, it is nothing but the cry of the political demagogue ambitious of regaining power, or the howl of faction famishing for its accustomed spoils. I am sufficiently sensitive, I trust, to the importance of maintaining the just authority of the state, and of all her functionaries, executive, administrative and judicial, acting within their appropriate spheres, and abundantly jealous of any encroachments upon the rights of either; but I am not at all moved by the outcry of those who see, or think they see, so much danger in imparting to, and upholding the general government at this hour in the exercise of the most rigorous powers with which it has been or can be clothed. Our greatest dangers heretofore have not been in this direction; while, on the contrary, our highest perils have arisen from unduly magnifying state authority, and countenancing, if not directly permitting, state interposition in matters committed by the constitution to the sovereign power of the union. This is the centrifugal force which has been constantly driving the state organizations in erratic courses out

In the matter of Hopson.

of their true orbits, until one after another "shooting madly from their spheres," they have launched forth into bewildering chaos, and unless brought back by the power and force of the great central orb, will lose themselves in the blackness of darkness forever.

It is strange that intelligent men at this day cannot see the perils that have beset this nation from the political heresies of the past, and that are now being revived and reinvigorated with life ; and stranger still, that the argument which teaches us the necessary supremacy of the constitution and the laws of the union should require to be re-stated and defended. That argument was made once and for all time in the great debate of 1830, when Daniel Webster stood up to speak for the whole American people, and, in the grapple of giants, came out of the arena clad in all the spoils of victory, over the nullifiers of his day and their imitators and sympathizers of ours. My creed on this subject is contained in the memorable speech on Foot's resolution — a speech that for far-reaching and statesmanlike sagacity, majestic eloquence, and profound and resistless logic, has no equal in our times, and no superior in any age.

Neither can I allow myself in the indulgence of any jealousy of the judicial functionaries of the general government, or any fears that they will not accord equal and exact justice to all their and our fellow-citizens. Why should we cherish this alien and hostile feeling towards our own paternal government and those whom we elect to administer it, responsible as they are to us their masters, and removable almost at our pleasure ? Above all, why should we entertain this watchful scrutiny and jealous fear lest the jurisdiction we renounce should either not be entertained on behalf of the citizen asking for protection, or, if entertained, imperfectly or dishonestly exercised ? The judges of the courts of the United States are with us, citizens not only of a common country, but each are residents in, and citizens of, separate and independent states. They have the same rights

of person and of personal liberty to conserve that we have, and the same feelings of state pride and local interest to cherish, where these do not conflict with higher duties to the common government to which we all owe a paramount allegiance. Many, if not all of them, have taken the same oath with us to support and maintain the constitutions of their respective states, as well as the constitution of the United States, and, in the words of Chief Justice Shaw, "are obliged to act upon the same principles, and be governed by the same rules of duty." Why, then, should we fear to commit our interests, and the interests, and rights, and liberties of our fellow-men, to the care and keeping, the protection and support of functionaries distinguished to a large degree for intelligence and integrity, and whose judicial independence, owing to the tenure of their office and the mode of their appointment, is in its essential elements far superior to ours. And, again, how unwise and how unmanly it is to be filled with perpetual alarm, lest the government should grow too strong, and, availing itself of the means we give it for present preservation, turn and trample in the dust the safeguards of personal liberty, and blot out forever all constitutional guarantees of freedom of speech, of the press, and of conscience. We guard with eagle-eyed vigilance the outposts and the bastions of the constitutional fortress, while traitorous hands are mining beneath the citadel and applying the torch to the magazine. We insist on "tithing mint and anise and cummin," preserving the constitution in its minutest letter and most straightened construction, and that, too, on behalf of men who have cast off its authority and repudiated its obligations, while we "forget the weightier matters of the law," that the whole fabric of free institutions is in danger of utter overthrow, and that there is a supreme rule of public safety, a spirit which looks to the conservation of national life, higher than the mere letter of parchment constitutions.

The good ship of state is in the midst of a terrific tem-

In the matter of Hopson.

pest, which threatens with destruction ship and passengers and cargo. In this hour of peril, instead of sitting down quietly to consult the chart which has been our sufficient guide in clear weather and calm seas, or speculating whether, with all the cargo safely under hatches, and all sails set, we cannot keep on the old track and escape the impending ship-wreck, it will be the part of wisdom to cast overboard every thing that may impede or embarrass us, let the masts go by the board, "let the rent canvass fluttering strew the gale," and every hand work with a will at the pumps. When we have outrode the storm, and are once more in a safe and quiet harbor, there will be time enough to reconstruct the fallen masts, repair the tattered sails, and restore all that is needful of the precious cargo. For one, I will consciously do nothing that shall weaken I will omit to do nothing—that may lawfully be done—that shall tend to strengthen the power of the national government in this hour of peril, and nerve its arm in grappling with and overcoming this foul and atrocious rebellion.

I know very well that it is the office of the judiciary to stand firmly by the law, to lay "judgment to the line, and righteousness to the plummet," for the humblest as well as the highest in the land. I hope not to be found wanting in that duty, nor to be swayed from a sound anchorage by the shifting tide of interest on the one hand, or the gusty waves of passion on the other. But if while following in the line of high and safe precedent, guided by the light that streams from the loftiest judicial watch-tower in the land, I can at the same time do something that may tend to perpetuate the institutions our fathers gave us, and lend vigor to the arm of the government in the performance of its solemn and momentous duty, to preserve, protect and defend our precious inheritance, to hold together in indissoluble bands that glorious union, the ark of our political safety, and not abandon it a prey to faction, "discordant, dissevered, bel-ligerent, rent with civil feuds, and drenched in fraternal

---

In the matter of Hopson.

---

blood;" if in the smallest degree I can contribute to such results, I perform a high and grateful function, and experience in its discharge a corresponding satisfaction.

The order for an attachment in this case is vacated, the writ of habeas corpus discharged, and the prisoner is to remain in the custody of the provost marshal, to be dealt with according to law.(*a*)

[At CHAMBERS, August 25, 1863.   Before *Bacon*, Justice.]

(*a*) A *certiorari* was sued out, for the purpose of obtaining a reversal of the above decision.   At the general term, held in the 5th district, on the 6th of October, 1863, Mr. *R. Conkling*, of counsel for the provost marshal, raised the objection that under the act of congress and the proclamation of the president of the United States suspending the writ of *habeas corpus* in certain cases, dated September 15, 1863, it was not proper for the court to entertain the case further.   After hearing arguments upon this point, a majority of the judges could not agree that the proclamation did not prevent any further action in the case; and consequently the court declined hearing an argument upon the merits.

The conclusion thus arrived at by the general term seems to be sustained by a decision of the *United States district court*, for the southern district of New York, made in the following case, in September, 1863.