## In re ANDERSON et al.

### (Circuit Court, W. D. North Carolina. May 20, 1899.)

1. FEDERAL COURTS—HABEAS CORPUS — PERSONS IN CUSTODY OF STATE AUTHORITIES.

It is a general rule that a person held in custody by the authorities of a state, charged with an offense, will not be discharged on a writ of habeas corpus by a federal court before his trial, but will be left to submit his defense to the state courts, and, if denied any rights under the federal constitution or laws, to pursue his remedy by direct proceedings in error to the supreme court of the United States; and it is only in exceptional cases that a federal court will exercise its discretionary power to interfere in the first instance.[1]

2. SAME.

Where, however, the act for which a person is held in custody by state authorities is one which was done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof, as where it was done as an officer of the United States in the execution of a process of a federal court of competent jurisdiction, and the officer acted within his jurisdiction and the scope of his process, he is entitled to federal protection, and will be discharged on a writ of habeas corpus.

3. UNITED STATES MARSHALS—EXECUTING PROCESS OUTSIDE OF DISTRICT.

Rev. St. § 788, providing that marshals and their deputies shall have in each state the same powers in executing the laws of the United States as sheriffs and their deputies may have by law in executing the laws thereof, refers only to the district in which the marshal is appointed, and gives him no authority to act as an officer outside of such district.

4. SAME.

A marshal who attempts to execute a process outside of his own district and in another state, although it is one relating to real estate, and the court in his district has assumed to exercise jurisdiction to determine rights therein, and in going upon the land he follows the command of his writ, acts as a trespasser, and the writ affords him no protection.

5. FEDERAL COURTS — HABEAS CORPUS — ARREST OF UNITED STATES MARSHAL BY AUTHORITIES OF ANOTHER STATE.

Petitioners for a writ of habeas corpus in a federal court, a deputy United States marshal of the Eastern district of Tennessee and his assistants, were arrested by the authorities of North Carolina, charged with the commission of an assault and other trespasses in that state. On the hearing it was shown that the acts charged against petitioners were committed while executing a writ of possession awarded by the United States circuit court in the Northern division of the Eastern district of Tennessee upon a decree entered in that court; that petitioners arrested the defendant found in possession of the land, and held him in custody for two days, while they removed his effects to a distance from the land, and dismantled his house; also, that the land was situated in the state of North Carolina. There was also evidence tending to show other acts of petitioners not warranted by the process under which they assumed to act. *Held*, that upon such showing they would not be discharged.

This was a hearing on the application of Murphy L. Anderson, William N. Barr, and George W. Metcalf for a writ of habeas corpus.

Will D. Wright, U. S. Atty., A. E. Holton, U. S. Atty., P. E. H. McCroskey, and Jones & Jones, for petitioners.

F. P. Axley, Ben Posey, J. H. Dillard, and Merrimon & Merrimon, for respondent.

[1] For jurisdiction of federal courts on habeas corpus, see note to In re Huse, 25 C. C. A. 4.

EWART, District Judge. The petition of Murphy L. Anderson avers that he is a citizen and resident of Knox county, Tenn., and that he is a duly authorized and empowered deputy marshal of the United States for the Eastern district of Tennessee, and that he is illegally, unjustly, and unlawfully held in duress, imprisoned, and detained in the town of Murphy, in Cherokee county, N. C., under the following circumstances and charges: That under a judgment rendered in the circuit court of the United States for the Northern division of the Eastern district of Tennessee, at Knoxville, on the 11th day of July, 1892, in case No. 864 (Stevenson et al. v. Lovingood et al.), a writ of possession for certain lands therein specifically described was awarded against the defendants in said suit; that in pursuance of said judgment a writ of possession was issued by the clerk of the circuit court on the 21st day of April, 1899, and was regularly placed in the hands of the petitioner Anderson, as deputy United States marshal, to execute; that in pursuance of this duty he proceeded to the lands described, and, anticipating some trouble, he summoned, as his posse and assistants, his co-petitioners, Barr and Metcalf, to assist him in the performance of his duty under the said writ of possession; that while in the discharge of said duty, and while peaceably, lawfully, and cautiously executing the said writ, assisted by his co-petitioners, Barr and Metcalf, he was, with his co-petitioners, arrested by one J. N. Elliott, claiming to be a constable in the county of Cherokee, N. C., by whom he was removed to the town of Murphy, where he is now held a prisoner. The petitioner further avers that on the 29th day of April, 1899, while the said Anderson, Barr, and Metcalf were held in custody by the said Elliott, one A. J. Martin, claiming to be the sheriff of the county of Cherokee, served other papers on the said Anderson, Barr, and Metcalf, as follows, viz.: A magistrate's warrant charging the said Anderson, Barr, and Metcalf with assaulting Jasper Fain with deadly weapons; second, a magistrate's warrant charging said Anderson, Barr, and Metcalf with making an assault upon and imprisoning Fain without warrant or authority or reasonable cause; third, by serving a process in a civil suit brought by the said Fain against the said Anderson, Barr, and Metcalf for damages for false imprisonment in the sum of $10,000, which last-named papers were served upon said parties,—and said Martin now claims to hold said Anderson, Barr, and Metcalf under arrest by him. The petitioners further aver that all these charges are based solely and entirely on their cautious, careful, and legal performance of their duties in executing the said writ of possession, and that the arrest of petitioners on the part of the said Elliott and Martin is part of a deliberate scheme, plan, and conspiracy on the part of the said Fain and his associates to prevent the execution of the said judgment against him, and are mere pretenses to that end. Petitioner further avers that when Anderson, Barr, and Metcalf were captured and put in duress under pretense of arrest by the said Elliott, they were on the waters of Tellico river, in Monroe county, Tenn., upon or near land described in said writ of possession, and in the peaceable and lawful discharge of their duties. Petitioners further aver that when they were arrested by the said Martin they were then

in duress and custody of men who were county officials of Cherokee county, where they have been illegally and forcibly taken, and that all of the said arrests were illegal and without probable cause, and that the said petitioners are wrongfully, illegally, and falsely deprived of their liberty, and are illegally under duress. The petitioner Metcalf avers that he is a citizen of the United States, and a citizen and resident of Knox county, Tenn., and that he is illegally and unjustly and unlawfully held in duress, imprisoned, and detained in the town of Murphy under the same circumstances and charges as set out by the petitioner Murphy L. Anderson. The petitioner William N. Barr avers that he is a citizen of the United States, and citizen and resident of Monroe county, Tenn., is the duly-elected and acting sheriff of said county, and that he is illegally, unjustly, and unlawfully held in duress, imprisoned, and detained in said town of Murphy under the same circumstances and charges set out in the petition of Murphy L. Anderson.

If it be true, as stated in the petition, that these petitioners are held in the custody of the authorities of Cherokee county "for an act done in pursuance of a law of the United States, or of an order, process or decree of a court or judge thereof," there does not seem to be any doubt but that under the statutes of the United States on that subject, they should be discharged by this court. Section 753, Rev. St., reads as follows:

"A writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof, or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process or decree of a court or judge thereof. * * *"

And section 761 declares that when, by writ of habeas corpus, the petitioner is brought up for hearing—

"The court or justice or judge shall proceed in a summary way to determine the facts of the case by hearing the testimony and arguments and thereupon to dispose of the party as law and justice require."

This, of course, means that if he is held in custody in violation of the constitution or law of the United States, or for an act done or omitted in pursuance of the laws of the United States, he must be discharged.

The facts in this case, as appear from the evidence heard by the court, are as follows:

A bill in equity was filed in the circuit court of the United States for the Northern division of the Eastern district of Tennessee by Stevenson et al. and George P. Wetmore, citizens, respectively, of the city and state of New York and of the state of Rhode Island, against Lovingood, Woody, Hoss, Fain, and Marr, all citizens and residents of the county of Monroe, state of Tennessee, and Nixon, a resident and citizen of Hamilton county, Tenn. The plaintiffs sued defendants for the recovery of certain tracts of land situate in Monroe county, in the state of Tennessee; and subpœna was issued, requiring the said defendants to appear and answer or demur, returnable August 5, 1889. Process was returned executed as to Lovingood, Woody, Hoss, and Marr; Fain not to be found. Nixon and Marr, de-

fendants, filed a disclaimer, disclaiming all right, title, or interest in any part of the said lands; and on the 26th of January, 1889, an order was made by the circuit court that as to defendants Lovingood, Woody, and Hoss, bill should be taken as confessed, and the cause set for hearing ex parte.    An alias subpœna was issued as to the defendant Fain.    On the 27th of January, 1892, the cause having been continued from time to time, the marshal having returned that Fain could not be found in his district, it was ordered by the court that Fain be directed to appear, plead, answer, or demur to the complainants' bill on or before March 1, 1892, and that a copy of this order be served on said Fain, if practicable, wherever found.    It was further ordered that, in case Fain did not appear within the time so limited, the court, upon proof of the service or publication of the said order, would entertain jurisdiction, and proceed to the hearing and adjudication of the above suit as if the said Fain had been served with process in said district.    On the 26th of May, 1892, service of said process was made on Fain by the United States marshal of the Western district of North Carolina, through his deputy, by delivering a copy of this order to the said Fain at Murphy, N. C.    On the 11th of August, 1892, a decree was signed by his honor, D. M. Key, of the circuit court for the Northern division of the Eastern district of Tennessee, rendering judgment by default as to Lovingood, Woody, Hoss, and Fain.    On the 10th of February, 1893, a writ of possession was issued and placed in the hands of the United States marshal.    On the 24th of May, 1893, this writ was executed by the United States marshal by removing Lovingood, Woody, and Hoss from the premises therein described; the returns of the marshal showing furthermore that Fain had been permitted to remain upon the premises through the agent of the plaintiffs, under an agreement between them.    On the 10th of February, 1894, an alias writ of possession was awarded, to be issued on application of complainants. On the 21st day of April, 1899, a writ of possession was issued by the circuit court of the United States for the Northern division of the Eastern district of Tennessee.    This writ of possession, after reciting the names of the complainants and defendants, directed that the marshal of the said district should put the complainants into possession of a certain tract or parcel of land, described in the writ as follows:

"In fractional township 2, range 7, East Ocoee district, section 5, section 6, section 7, section 8, section 9, section 16, section 17, section 18, section 19, section 20, section 21, section 28, section 29, section 30, section 31, section 32."

This writ of possession was placed in the hands of Murphy L. Anderson, a United States deputy marshal for the Eastern district of Tennessee.    It appears from the evidence that, in consequence of information received by the said Anderson from the attorneys representing the complainants, the deputy marshal anticipated that he would have trouble in ejecting the defendant Fain, and that he summoned Barr, the sheriff of Monroe county, to assist him in ejecting the said Fain.    On arriving at the house of Fain, he informed him of his business, and requested him to at once give possession of the premises which he occupied.    It further appears that Metcalf was

the authorized agent of the Stevenson heirs and Wetmore, complainants in the bill of equity, and that about this time he came up armed with a Winchester rifle, and stated to the said Anderson that he was the agent of the owners of the said property, and was ready to take possession of the property when Fain was ejected. It further appears that Anderson informed him that there would probably be some trouble in ejecting Fain, and that he would summon him to assist him in ejecting the said defendant Fain. As to whether any resistance was made by Fain, there is some conflict in the evidence; the officers insisting that Fain made an attempt to get his gun, which had been taken charge of by one of the officers, and the defendant Fain denying that he made any resistance, but simply stated to the officers that he was a citizen of the state of North Carolina, and that they had no right to interfere with his real or personal property in that state. It further appears that the officers placed him under arrest, and one of the officers, producing a pair of handcuffs, ordered that they should be placed upon him. On the remonstrance of Fain against this course, he was not handcuffed, but, it appears, was held as a prisoner by them over his protest for a period of two days or more. It further appears that one Mitchell, an employé of Fain, was also arrested and held in custody for a period of over two hours. The personal effects of Fain and Mitchell were then taken by the officers from the house, and hauled a distance of nearly four miles to a point across the state line, or where the state line was alleged to be by one of the petitioners,—Metcalf. It further appears that the officers proceeded to dismantle the house of Fain to that extent as to make it uninhabitable. While petitioners were at a place occupied by a party named Roberts, alleged by the petitioners to be in the county of Monroe and state of Tennessee, and while they still held Fain in their custody, one Elliott, a constable from the county of Cherokee, and state of North Carolina, with a posse, arrested the petitioners on a warrant issued by a justice of the peace of the county of Cherokee, charging petitioners with having committed an assault with a deadly weapon upon Fain. The petitioners were taken to the town of Murphy, in the county of Cherokee, where other warrants charging them with the offenses named in the petition of petitioners were served upon them; also, civil process in arrest bail proceedings.

The only question arising in this case is whether the petitioners are held in the state courts to answer for an act which they were authorized to do by the laws of the United States, which it was their duty to do as deputy marshals, and whether in the discharge of their duties they did more than was necessary and proper for them to do.

The general rule, as laid down by leading decisions of our courts, is that parties being prosecuted in state courts will not be released on writs of habeas corpus, but will be left to reach the supreme court of the United States by writ of error. This rule is abundantly sustained by numerous decisions, but it is equally as well established that the federal courts have power to grant writs of habeas corpus if special circumstances require, and that such courts possess a discretion in the matter which must be governed by the facts in each

particular case.    Let us briefly examine a few of the leading cases establishing this principle.

In Ex parte Royall, 117 U. S. 247, 6 Sup. Ct. 740, Mr. Justice Harlan says:

"Does the statute imperatively require the circuit court by writ of habeas corpus to wrest the petitioner from the custody of the state officers in advance of his trial in the state court?  We are of the opinion that while the circuit court has power to do so, and may discharge the accused in advance of his trial if he is restrained of his liberty in violation of the national constitution, it is not bound in every case to exercise such a power immediately upon application being made for the writ.  We cannot suppose that congress intended to compel these courts by such means to draw to themselves in the first instance the trial of all criminal prosecutions commenced in state courts exercising authority within the same territorial limits, where the accused claims that he is held in custody in violation of the constitution of the United States.  The injunction to hear the case summarily, and therefore to dispose of the case as law and justice require, does not deprive the court of discretion.  That discretion should be exercised in the light of the relations existing under our system of government between the judicial tribunals of the Union and of the states, in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the constitution."

In Re Wood, 140 U. S. 278, 11 Sup. Ct. 738, the same doctrine is laid down and reaffirmed.

In Cook v. Hart, 146 U. S. 183, 13 Sup. Ct. 40, the court says:

"Whilst power to issue writs of habeas corpus to state courts which are proceeding in disregard of the right secured by the constitution and laws of the United States may exist, the practice of exercising such a power before the question has been raised or determined in the state courts is one which ought not to be encouraged.  Should such rights be denied, his remedy in the federal courts will be unimpaired."

In Re Frederich, 149 U. S. 73, 13 Sup. Ct. 795, the court says:

"While a writ of habeas corpus is one of the remedies for the enforcement of the right of personal freedom, it will not issue as a matter of course, and it should be cautiously used by federal courts in reference to state prosecutions."

In New York v. Eno, 155 U. S. 90, 15 Sup. Ct. 30, it is decided that the United States court should refuse to issue writs of habeas corpus unless it also appears that the case is one of urgency.    In Re Belt, 159 U. S. 100, 15 Sup. Ct. 987, Chief Justice Fuller says that it is only in rare and exceptional cases that such writs should be issued.

In Re Swan, 150 U. S. 648, 14 Sup. Ct. 228, Mr. Chief Justice Fuller says:

"We reiterate what has been so often said before,—that a writ of habeas corpus cannot be used to perform the office of a writ of error or appeal, but when no writ of error or appeal will lie, or if a petitioner is imprisoned under a judgment of the circuit court which has no jurisdiction of the prisoner or of the subject-matter, or authority to render the judgment complained of, this relief may be accorded him."

In Re Tyler, 149 U. S. 164, 13 Sup. Ct. 785, the same doctrine is affirmed.

In Ex parte Royall, and other cases cited, is illustrated how careful federal courts are in exercising a discretionary power to interfere with processes issued under state courts; that it is not only a

matter of comity, but is a principle of right and law, and therefore of necessity, and it is the duty of these courts to conciliate, rather than alienate and dissever, the federal and state tribunals, so that they may co-operate as harmonious members of one judicial system. As has been said by a distinguished writer, this machinery of a federal government is at once delicate and complex, and consists of plans and adjustments for all time to come, so that there may be no friction; like the harmony of our solar system, where each planet moves in its own orbit, without any impingement by the greater orb which lights all. In the decisions of the federal courts—both circuit and district courts and the circuit court of appeals—we find many important cases reported relating to proceedings in habeas corpus instituted under the provisions of section 753, Rev. St. U. S. In every instance where efforts have been made by the state courts to obstruct the execution of federal processes placed in the hands of federal officers, emanating from courts of competent jurisdiction, and where the officers acted within their jurisdiction and within the scope of their process, the courts have never hesitated to throw around them every measure of protection, and to promptly accord to them the privileges of the writ of habeas corpus. Perhaps the most important cases cited are:

First, Ex parte Siebold, 100 U. S. 371. This case involved the constitutionality of certain sections of title 26, Rev. St., entitled "Elective Franchises." A marshal of the United States was arrested by state officers while attempting to enforce process under this law. In proceedings in habeas corpus he was promptly discharged by the federal courts.

U. S. v. Jailer, 2 Abb. (U. S.) 265, Fed. Cas. No. 15,463, is another important case. This was a case where a deputy marshal was arrested by Roberts in endeavoring to serve process upon Call, charged with crime under the internal revenue laws, and who was killed by Roberts. He was arrested by state authorities, and on proceedings in habeas corpus was promptly discharged by the United States judge, the proof being conclusive that he was in the actual discharge of his duties when he was assaulted by Call. In this case the judge delivering the opinion says:

"I disclaim all right and power to discharge the relator on any such ground as that the proof shows that he acted in self-defense. A jury would probably acquit him on such ground, independent of the process under which he acted, but I have nothing to do with such an inquiry. It belongs only to the state court. I have only to inquire whether what he did was in pursuance of a law and process of the United States, and so justified, not excused, by that law and process."

In Re Neagle, 135 U. S. 3, 10 Sup. Ct. 658, it was held that it was the duty of the United States marshal to protect the person of a United States judge; and in an assault made upon such judge, where the deputy marshal took the life of the assailant, it was held by the court that he was acting within the scope of his duties, and that he could not be committed to the custody of the state courts and tried for the offense.

In Re Loney, 134 U. S. 372, 10 Sup. Ct. 584, it was held that a defendant arrested for perjury committed in the case of a contested

congressional election should be discharged on a writ of habeas corpus, because a charge of such perjury was within the exclusive cognizance of the courts of the United States, and to permit it to be prosecuted would greatly impede and embarrass the administration of justice in the national tribunals. See, also, In re Krug, 79 Fed. 309.

In Re Lewis, 83 Fed. 161, the petitioners in proceedings in habeas corpus were special employés of the treasury department. In making a search of the premises of Yeegee, certain papers supposed to contain incriminating evidence against Yeegee were seized. The petitioners were indicted in the state courts for robbery. The judge presiding in the United States circuit court held that they were in discharge of their official duties, and that, while their conduct was not perhaps entirely what it should have been, in searching the premises and seizing these papers they acted in good faith and with no felonious purpose or intention, and that, as they were in the actual discharge of their duties, they should be discharged.

In all these cases it will be observed that, in every instance where petitioners in proceedings in habeas corpus were discharged, it was upon proof that they were at the time actually engaged in carrying out or enforcing a decree, process, or mandate of the United States courts, or that the right of a citizen, secured and guarantied by the constitution of the United States, had been infringed upon. But it will also be observed that the vital principle running through our laws is that, subject to well-defined exceptions, not material to be stated here, the authority of the United States marshals and their deputies to act in an official capacity is confined entirely to the respective districts for which they have been appointed. The official character of such officers can only be recognized in their own districts. Outside of such district, except in certain special cases, not material in this consideration, they are simply private citizens, and as such amenable to the laws of the place where they chance to be. No warrants can be served by such officers outside of their districts, no process of any character or description can be executed, and their official authority can only be recognized in the districts of which they are officers.

In Walker v. Lea, 47 Fed. 645, Justice Lamar, of the supreme court, reversing the judgment of the district court, decided that a deputy marshal of the state of Tennessee, while temporarily in Mississippi, having heard of the whereabouts of a party for whom he had a process, and who, arming himself, went in search of such party, and while actually engaged in effecting the arrest of such party was arrested by state officers, charged with the offense of carrying concealed weapons, was not entitled to be discharged on a writ of habeas corpus instituted in the federal courts. The effect of this decision was to declare that section 788, Rev. St., cited by counsel for petitioners, providing that marshals and their deputies shall have in each state the same powers in executing the laws of the United States as sheriffs and their deputies may have by law in executing the laws thereof, refers only to the district to which the marshals are appointed. See, also, the case

of Toland v. Sprague, 12 Pet. 300; Ex parte Graham, 3 Wash. C. C. 456, Fed. Cas. No. 5,657; Day v. Manufacturing Co., 1 Blatchf. 628, Fed. Cas. No. 3,685.

In Re Huse, 25 C. C. A. 2, 79 Fed. 306, Judge Hawley says:

"It was never intended by congress that the courts of the United States should, by writs of habeas corpus, obstruct the ordinary administration of the criminal laws of a state."

In Ableman v. Booth, 21 How. 524, and U. S. v. Booth, Id., Mr. Chief Justice Taney, delivering the opinion of the court, says:

"No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court or judge by whom it is issued, and any attempt to enforce it beyond these boundaries is nothing less than lawless violence."

In the case of Whitten v. Tomlinson, 160 U. S. 247, 16 Sup. Ct. 302, Mr. Justice Gray says:

"A prisoner in custody under the authority of a state should not, except in a case of peculiar urgency, be discharged by a court or a judge of the United States upon a writ of habeas corpus in advance of any proceedings in the courts of the state to test the validity of his arrest and detention. To adopt a different rule would unduly interfere with the exercise of the criminal jurisdiction of the several states, and with the performance by this court of its appropriate duties."

How far courts are bound to interfere for the protection of their own officers is a question upon which there are many perplexing and conflicting decisions. In Peck v. Jenness, 7 How. 624, the court say:

"It is a doctrine of law too long established to require citation of authorities that where a court has jurisdiction it has a right to settle every question which occurs in a cause, and, whether its decision be correct or not, its judgment, till reversed, is regarded as binding in every act, and that where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, the right cannot be wrested or taken away by any proceedings in another court."

In Erskine v. Hohnbach, 14 Wall. 613, the court says:

"It is easy to see what widespread mischief might result from permitting an executive officer to decide on his own knowledge that he ought not to serve a process or warrant put into his hands for service, and to consider what justly must follow from such doctrine. In short, the executive officer must do his duty, which is to obey all legal writs, and must not abrogate to himself the right of disobeying the paramount commands of those to whose mandates by law he is subjected. It seems that the weight of authority and of reason is clearly in favor of the proposition that the officer may safely obey all process fair on its face, and is not bound to judge of it by facts within his knowledge which may be supposed to invalidate it, and which the party aggrieved thereby may institute against him, although serious errors may have been committed by the officer or tribunal in reaching the conclusion in which the order of process was issued."

See Savacool v. Boughton, 5 Wend. 171; Earl v. Camp, 16 Wend. 563; Chegaray v. Jenkins, 5 N. Y. 376; Sprague v. Birchard, 1 Wis. 457; Dynes v. Hoover, 20 How. 65.

As stated by an eminent text writer, it seems to be that the only question for a ministerial officer is, in the execution of a process coming into his hands, whether such process is issued from a court

of competent jurisdiction, and is regular on its face. If such process is issued by a court of competent jurisdiction, and is regular on its face, he is by law required to act. The manner, time, and circumstances of his action are prescribed. He has no discretion. His action may be compelled by legal process. His duty is to do, not reason why.

In Illinois there are dicta in a number of cases (Barnes v. Barber, 6 Ill. 401; McDonald v. Wilkie, 13 Ill. 22), followed by an authoritative decision (Leachman v. Dougherty, 81 Ill. 324), that where an officer has notice of an excess or want of jurisdiction in the magistrate from which his process emanates, he would render himself liable for acting under it. This doctrine has been approved by the courts of Wisconsin. Sprague v. Birchard, 1 Wis. 457. But these decisions have not met with general acceptance. It is expressly denied in the state of New York, where the courts decided, in Webber v. Gay, 24 Wend. 485, and People v. Warren, 5 Hill, 440, that in a case in which jurisdiction to issue the particular process depended on the defendant's residence within the jurisdiction of the county, and the officer knew him to be a nonresident, such officer was not liable for acting under such process. Similar decisions have been rendered in the courts of Connecticut. In Buck v. Colbath, 3 Wall. 345, the court held that it was the duty of a court of competent jurisdiction, issuing its process, to protect its officers from being harassed or interfered with by any person, whether a party to the litigation or not.

It has been contended by the able counsel for the respondents in this case that the circuit court for the Northern division of the Eastern district of Tennessee had no jurisdiction of a proceeding in ejectment, and that its proceedings were coram non judice. In support of this contention, Whitehead v. Shattuck, 138 U. S. 151, 11 Sup. Ct. 277, is relied upon. Mr. Justice Field, delivering the opinion of the court, says:

"It will be difficult, and perhaps impossible, to state any general rule which would determine in all cases what should be deemed a suit in equity, as distinguished from an action at law, but this may be said: that, where an action is simply for recovery and possession of specific real or personal property, the action is one at law. An action for recovery of real property, including damages for withholding it, has always been of that class. The right which in this case the plaintiff wishes to assert is his title to certain real property, and the remedy which he wishes to obtain is its possession and enjoyment; and, in a contest over a title, both parties have a constitutional right to call for a jury."

Referring to the act of the legislature of Iowa conferring jurisdiction upon courts of equity to hear and adjudge causes instituted in such courts for the possession of real property (138 U. S. 152, 11 Sup. Ct. 277), Mr. Justice Field says:

"If that be its meaning, an action like the present can be maintained in the courts of that state, where equitable and legal remedies are enforced by the same system of procedure and by the same tribunals. It thus enlarges the powers of a court of equity as exercised in the state courts, but the law of that state cannot control the proceedings in the federal courts, so as to do away with the force of the law of congress declaring that 'suits in equity shall not be sustained in either of the courts of the United States in any case where a plain, adequate, and complete remedy may be had at law,' or the constitutional right of the parties in action at law to a trial by jury."

It is true that in every proceeding of a judicial nature there are one or more facts which are strictly jurisdictional, the existence of which is necessary to the validity of the proceedings, without which the action of the court is a mere nullity; such, for example, as the service of process in the state of the defendant in a common-law action. D'Arcy v. Ketchum, 11 How. 165; Webster v. Reid, Id. 436; Pennoyer v. Neff, 95 U. S. 714; Noble v. Railroad Co., 147 U. S. 173, 13 Sup. Ct. 271.

If this position be correct, as urged by counsel for respondents, the proceedings in the circuit court in Tennessee in this case were coram non judice, and the writ of possession issued by such court, and placed in the hands of the marshal for enforcement, was a nullity; but this court is not an appellate court, nor has it any power to modify or annul the judgment of a federal court in another state. But, while it is vested with no such powers, it certainly can inquire, in a proceeding such as is now pending before this court, whether the petitioners attempted to execute a process emanating from a federal court in the state of Tennessee in the state of North Carolina, or whether such officers, in attempting to enforce such a process outside of the limits of their state, and in the confines of another state, committed an assault with deadly weapons upon a citizen of this state, or arrested him without process or without reasonable cause or justification. or destroyed his property, such property being within the limits of this state. Certainly, if such officers crossed the boundary lines between the states of Tennessee and North Carolina, and, entering upon North Carolina territory, proceeded to violate the laws of this state, such officers were not in the discharge of any duty enjoined upon them by the laws of the United States, nor were they executing any process or mandate issued by the courts of the district of Western North Carolina.

It is insisted by the petitioners that they were acting within the limits of the Northern division of the Eastern district of Tennessee in executing this process, issued, as they insist, by the circuit court of the said district,—a court of competent jurisdiction. In attempting to ascertain whether such officers crossed the state line and executed such process in the state of North Carolina, much evidence was introduced by both the petitioners and respondents, and heard by this court. It appears from such evidence that in the year 1789 an act was passed by the general assembly of the state of North Carolina, known as the "Cession Act," empowering one of the senators of the state of North Carolina, and two of the representatives, to execute a deed or deeds on the part and in behalf of the state conveying to the United States of America "all right, title and claim which the state has to the sovereignty and territory of the land situate within the chartered limits of the state west of the line beginning on the extreme height of the Stone Mountain at a place where the Virginia line intersects it;   *   *   *   thence to a place where it is called the Great Iron or Smoky Mountains; thence along the extreme height of the said mountain to a place where it is called to Unacoy or Unaka Mountain; between the Indian towns of Cowee and Old Chota; thence along the main ridge of the said mountains to the

94 F.—32

southern boundary of this state." See Rev. St. N. C. p. 172. A controversy arose concerning the Unaka Mountain, and commissioners were appointed by an act passed in 1796 by the legislature of Tennessee and the legislature of North Carolina to ascertain which was the mountain so called in the act of cession. In 1819 an act was passed by the North Carolina legislature declaring that it was essential to the interests of this state in the disposal of the lands lately acquired by treaty from the Indians, and to the continuance of the good understanding and happiness subsisting between this state and the state of Tennessee, that the boundary lines between the two states should be accurately run, distinctly marked, and permanently established. The commissioners met at Newport, Tenn., on the 14th of July, 1821, to make the necessary arrangements for running and completing the line between the two states. See Rev. St. N. C. p. 93. In the year 1821 an act was passed by the legislatures of both the states of Tennessee and North Carolina confirming the boundary line established by these commissioners, and located and marked by the commissioners appointed by the two states. The act of the North Carolina legislature confirming said boundary line specifies that the whole line was distinctly marked as follows: "Two chops and a blaze on each fore and aft tree; three chops on each side line tree; a mile mark at the end of each mile." The evidence as to the location and marking of this line with the marks described in the act of 1821 by the commissioners appointed by the states of Tennessee and North Carolina is, to my mind, conclusive. There can be no sort of question but that the line was established, located, and marked on what is known as the "state ridge line," and which has been generally recognized from that date to this as the true boundary line between the states of Tennessee and North Carolina. The petitioners insist that this was not the true line between the two states, and was not the line located and marked by the commissioners under the act of 1819. They insist that the line marked on the maps in evidence, referred to as the "rainbow line," is the true boundary line between the two states, but there seems to be very little proof to sustain that contention. The weight of the testimony is that the line known as the "state ridge line" was the line located and marked by the commissioners; that the act of the commissioners in so locating and marking this line was fully ratified and approved by the people of the states of Tennessee and North Carolina, through their respective general assemblies, by Act 1821. It is true that the state of Tennessee has issued grants for the land within what are known as the state ridge and rainbow lines, and it is probable that the lands claimed by Stevenson and Wetmore are within this boundary, though it appears no actual survey has been made of the alleged rainbow line. But it is also true that the state of North Carolina has for many years exercised sovereignty over the same territory, by issuing grants to its citizens, collecting taxes from them, requiring them to work its public roads, and recognizing residents within that territory as citizens of North Carolina. If the state ridge line be the correct and true dividing line between the states,—a fact of which, from the evidence submitted to this court, there can be no doubt,—

the act of Anderson, Barr, and Metcalf in crossing the state line and forcibly ejecting from his possessions a citizen of North Carolina, who held his title under and by virtue of a grant from the state of North Carolina, in violently dispossessing the said Fain, a citizen of North Carolina, and in removing his personal effects a distance of four miles, against and over his protest, in committing an assault upon him with deadly weapons, in threatening to place handcuffs upon him, and in arresting him and holding him in custody for a period of over 48 hours, without any warrant and without any reasonable excuse or justification, was an act nothing short of lawless violence on the part of such officials. Under the process issued by the circuit court of Tennessee, a court of competent jurisdiction, these officers had the undoubted right to enforce such process to its fullest extent within the jurisdiction of the United States circuit court for the Northern division of the Eastern district of Tennessee, but not one inch beyond such district. Whenever they crossed the boundary lines of a sovereign state, they ceased to be officers. They were private citizens only, and had no right to arrest a citizen of North Carolina and subject him to imprisonment or indignities. No court will go further than this court in protecting the officers of the federal government in the discharge of their duties; and if at any time such officers, in the peaceable and lawful discharge of their duties within the jurisdiction of this court, are interfered with or obstructed in any way, directly or indirectly, by the officers of the state, or officers acting under the instruction of state courts or tribunals, immediate relief will be granted them by this court, upon the proper application for the same. But officers of the federal government must act within their own jurisdiction, and always within the scope of their warrant or process. Federal courts were not established for the purpose of discharging federal officials when charged with violation of state laws, simply because they hold commissions from the federal government; nor was this statute granting relief to federal officers when charged with violation of state laws passed for the purpose of relieving such officials from deserved prosecution and conviction in the state courts, but the statute was passed to prevent needless, unnecessary, or unlawful obstruction and hindrance of federal officials when actually carrying out or enforcing the laws, decrees, or mandates of the United States courts, and while acting within their jurisdiction, and within the limits of the warrants or process in their hands.

In this case there can be no reason why the petitioners cannot have a fair and impartial trial in the courts of the state of North Carolina. If their contention be true, that they were engaged in executing a process issued by the circuit court of Tennessee in the county of Monroe, in the state of Tennessee, and acting strictly within the limits of such process, certainly they are not guilty of any violation of the laws of North Carolina. If manifest wrong or injustice is done them in such courts, they have the right to invoke the aid of the federal courts, even after judgment rendered by the state courts. The writ of habeas corpus in this case is denied, and the prisoners remanded to the custody of the state court.